SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**State v. Vonte Skinner (A-57/58-12) (071764)**

**Argued November 6, 2013 -- Decided August 4, 2014**

**LaVECCHIA, J., writing for a unanimous Court.**

In this appeal, the Court considers whether graphically violent rap lyrics, written by a defendant before the events that led to his indictment for attempted murder and related charges, may be admitted at his trial as evidence of motive and intent, pursuant to N.J.R.E. 404(b).

On November 8, 2005, Lamont Peterson was shot seven times in his back, torso, and head.  En route to the hospital, Peterson told police that defendant, Vonte Skinner, had shot him.  Although Peterson initially stated that the "code of the street" precluded him from cooperating further, he eventually told police that he and defendant sold drugs for Brandon Rothwell, and that defendant was the group's "muscle."  Peterson stated that defendant had shot him because Peterson owed Rothwell money.  When questioned, defendant admitted to being present at the scene, but denied involvement in the shooting, claiming that he fled when he heard the gunshots and left his vehicle behind.  The police searched the car and discovered three notebooks filled with profane and violent rap lyrics authored by defendant.  Many of the lyrics are written in the first person under the moniker "Real Threat," and defendant has the word "Threat" tattooed on his arm.  Although it is not clear when each verse of the lyrics was written, the State concedes that many were composed before the circumstances underlying the instant offense took place.

Defendant was charged with first-degree attempted murder and related charges, and, before trial, he requested a preliminary hearing to contest the admissibility of his rap lyrics.  The court concluded that the lyrics were relevant because they tended to prove the State's theory of the case and found them admissible under N.J.R.E. 404(b) because they provided insight into defendant's alleged motive and intent.  Accordingly, the court ordered that redacted portions of defendant's lyrics would be admitted into evidence.

Defendant's first trial resulted in a mistrial after the jury was unable to reach a unanimous verdict.  Prior to his retrial, defendant renewed his objection to the admissibility of the rap lyrics, and the court again found them admissible.  At defendant's second trial, a detective testifying for the State read to the jury extensive passages from defendant's lyrics, depicting violence, bloodshed, death, and dismemberment unconnected to the specific facts of the attempted-murder charge against defendant.

At trial, defendant advanced a third-party-guilt theory, contending that Peterson was shot by another man, Joseph Ward, with whom Peterson had an ongoing dispute.  Peterson testified that the "code of the street" required Ward to retaliate against him for the dispute, but insisted that defendant, and not Ward, was his assailant.  During closing arguments, the prosecutor compared the "street code" to a "subculture of violence," and intimated that "this sub-culture of violence . . . at some point is going [to] overtake the regular culture."  The jury convicted defendant of attempted murder, aggravated assault, and aggravated assault with a deadly weapon, and the trial court imposed an aggregate thirty-year sentence with an eighty-five percent parole disqualifier.

An Appellate Division panel, with one judge dissenting, reversed defendant's conviction based upon the admission of his rap lyrics into evidence.  In reaching its conclusion, the majority analyzed the admittedly violent lyrics under N.J.R.E. 404(b), and determined that their prejudicial impact vastly outweighed any potential probative value.  The majority also believed that the State had access to other, less prejudicial, evidence concerning defendant's motive and intent, and that "[t]he only logical relevance [of defendant's lyrics] was to give additional weight to Peterson's testimony."  The dissent argued, among other things, that the introduction of defendant's rap lyrics made the inference of defendant's motive and intent more logical.

1

The State filed an appeal as of right, pursuant to Rule 2:2-1(a)(2). Defendant also filed a petition for certification, which the Court granted limited to his claim that the prosecutor exceeded the bounds of permissible advocacy in his closing argument. 214 N.J. 174 (2013). The Court granted amicus curiae status to the Attorney General and the American Civil Liberties Union of New Jersey.

**HELD**: The Appellate Division correctly reversed defendant's conviction because the violent, profane, and disturbing rap lyrics authored by defendant constitute highly prejudicial evidence that bore little or no probative value as to any motive or intent behind the attempted murder offense with which he was charged.

1. Only once before has the Court assessed the admission of song lyrics as evidence adduced against a criminal defendant. In State v. Koskovich, 168 N.J. 448, 484-87 (2001), the Court affirmed the admission of violent lyrics authored by a defendant as proof of a "thrill kill" motive under N.J.R.E. 404(b). N.J.R.E. 404(b) provides generally that evidence of other crimes, wrongs, or acts may not be admitted to show that a person acted in conformity therewith, but may be admitted for other purposes when such matters are relevant to a material issue in dispute. Here, as in Koskovich, the trial court and the Appellate Division utilized N.J.R.E. 404(b) to assess the admissibility of the defendant's lyrics. In doing so, the courts followed the four-factor test from State v. Cofield, 127 N.J. 328, 338 (1992). (pp. 19-27)

2. This Court, in its analysis, initially considered argument as to whether artistic expressions about crimes or bad acts should be evaluated under N.J.R.E. 404(b). To be sure, writing rap lyrics – even disturbingly graphic lyrics, like defendant's – is not a crime. Nor is it a bad act or a wrong to write about unpalatable subjects. However, the purpose of Rule 404(b) is to safeguard against propensity evidence that may poison the jury against a defendant, such as violent, degrading rap lyrics of the type authored by defendant. Our courts have recognized that expressive actions, which are not overtly criminal but can be perceived as wrong or bad, can persuade a jury of a defendant's guilt, regardless of the State's evidence. Thus, the purpose of N.J.R.E. 404(b) is advanced by its application in this setting. Moreover, the admissibility of the lyrics was addressed under a Rule 404(b) framework by both the trial court and Appellate Division, and the State consented to that analysis. There was also no argument by the State that the rap lyrics constituted direct evidence of the offense involved in this matter. Instead, the lyrics were advanced for the purposes of proving motive and intent. A Rule 404(b) analysis therefore was appropriate. (pp. 27-31)

3. Under the Rule 404(b) framework, the other crime, wrong, or bad-act evidence must bear on a material issue in dispute. Although defendant's motive was genuinely in dispute in this case, the State offered other evidence on that issue. The effect of the lyrics was simply to bolster the State's motive theory, testified to by a State's witness. However, this Court repeatedly has discouraged the use of other-crime evidence to bolster the credibility of a testifying witness. In addition, defendant's lyrics only bear on the issue of motive if one believes that those lyrics, many of which were written long before Peterson's shooting, specifically relate to defendant's motive on the evening Peterson was shot. Moreover, it has not been established by clear and convincing evidence, as required under prong three of Cofield, that defendant engaged in any of the events portrayed in his rap lyrics. Thus they can only be regarded as fictional accounts. Finally, the prejudicial effect of defendant's graphically violent rap lyrics overwhelms any probative value that they may have. (pp. 31-34)

4. In assessing the probative value of defendant's fictional lyrics, the Court notes that probative evidence may not be found in an individual's artistic endeavors absent a strong nexus between specific details of the artistic composition and the circumstances of the offense for which the evidence is being adduced. The Court explains that the difficulty in identifying probative value in fictional or other forms of artistic self-expressive endeavors is that one cannot presume that, simply because an author has chosen to write about certain topics, he or she has acted in accordance with those views. One would not presume that Bob Marley, who wrote the well-known song "I Shot the Sheriff," actually shot a sheriff, or that Edgar Allan Poe buried a man beneath his floorboards, as depicted in his short story "The Tell-Tale Heart," simply because of their respective artistic endeavors on those subjects. The Court reasons that defendant's lyrics should receive no different treatment. This approach is in accord with other jurisdictions that have considered similar questions. The Court concludes that the violent, profane, and disturbing rap lyrics authored by defendant constitute highly prejudicial evidence against him that bore little or no probative value as to any motive or intent behind the attempted murder offense with which he was charged. The admission of defendant's inflammatory rap verses, a genre that certain members of society view as art and others view as distasteful and descriptive of a mean-spirited culture, risked poisoning the jury against defendant. (pp. 2-3; 34-39)

5.  In sum, rap lyrics, or like fictional material, may not be used as evidence of motive and intent except when such material has a direct connection to the specifics of the offense for which it is offered in evidence and the evidence's probative value is not outweighed by its apparent prejudice.  In the weighing process, courts should consider the existence of other evidence that can be used to make the same point.  When admissible, such evidence should be carefully redacted to ensure that irrelevant, inflammatory content is not needlessly presented to the jury.  (pp. 39-40)

6.  Because the Court's holding will require a retrial, the Court does not reach the merits of defendant's claim of prosecutorial excess in summation.  Nevertheless, the Court cautions that a prosecutor's summation should not employ language designed to stoke a jury's fear for the future of its community or make an inflammatory argument akin to a "call to arms."  (pp. 40-41)

The judgment of the Appellate Division is **AFFIRMED.**

**CHIEF JUSTICE RABNER; JUSTICES ALBIN, PATTERSON, and FERNANDEZ-VINA; and JUDGE RODRÍGUEZ (temporarily assigned) join in JUSTICE LaVECCHIA's opinion.  JUDGE CUFF (temporarily assigned) did not participate.**

STATE OF NEW JERSEY,

     Plaintiff-Appellant
     and Cross-Respondent,

        v.

VONTE L. SKINNER,

     Defendant-Respondent
     and Cross-Appellant.


     Argued April 9, 2014 – Decided August 4, 2014

     On appeal from and certification to the
     Superior Court, Appellate Division.

     Jennifer B. Paszkiewicz, Assistant
     Prosecutor, argued the cause for appellant
     and cross-respondent (Robert D. Bernardi,
     Burlington County Prosecutor, attorney).

     Jason A. Coe, Deputy Public Defender, argued
     the cause for respondent and cross-appellant
     (Joseph E. Krakora, Public Defender,
     attorney; Karen E. Truncale, Assistant
     Deputy Public Defender, on the briefs).

     Joseph A. Glyn, Deputy Attorney General,
     argued the cause for amicus curiae Attorney
     General of New Jersey (John J. Hoffman,
     Acting Attorney General, attorney).

     Ezra D. Rosenberg argued the cause for
     amicus curiae American Civil Liberties Union
     of New Jersey Foundation (Edward L. Barocas
     and Dechert, attorneys; Mr. Rosenberg, Mr.
     Barocas, Jeanne LoCicero, and Alexander R.
     Shalom, of counsel; Mr. Rosenberg, Mr.
     Barocas, Ms. LoCicero, Mr. Shalom, Michelle

Hart Yeary, and Cara J. Schmidt, a member of
the New York bar, on the brief).

JUSTICE LaVECCHIA delivered the opinion of the Court.

In the criminal trial of defendant, Vonte Skinner, on attempted murder and related charges, a State's witness was permitted to read to the jury, at great length, violent and profane rap lyrics that had been written by defendant before the events at issue. There was no assertion at trial that the violence-laden verses were in any way revealing of some specific factual connection that strongly tied defendant to the underlying incident. Nevertheless, the State maintained that the lyrics helped to demonstrate defendant's "motive and intent" in connection with the offense because the rap lyrics addressed a street culture of violence and retribution that fit with the State's view of defendant's role in the attempted murder.

The Appellate Division reversed defendant's conviction based on the admission of the rap lyrics into evidence in defendant's trial. In reaching its conclusion, the panel used an N.J.R.E. 404(b) analysis and determined that the prejudicial impact of defendant's rap lyrics vastly outweighed any potential probative value.

We affirm. We hold that the violent, profane, and disturbing rap lyrics authored by defendant constituted highly prejudicial evidence against him that bore little or no

probative value as to any motive or intent behind the attempted murder offense with which he was charged. The admission of defendant's inflammatory rap verses, a genre that certain members of society view as art and others view as distasteful and descriptive of a mean-spirited culture, risked poisoning the jury against defendant. Fictional forms of inflammatory self-expression, such as poems, musical compositions, and other like writings about bad acts, wrongful acts, or crimes, are not properly evidential unless the writing reveals a strong nexus between the specific details of the artistic composition and the circumstances of the underlying offense for which a person is charged, and the probative value of that evidence outweighs its apparent prejudicial impact. In the weighing process, trial courts should consider the existence of other evidence that can be used to make the same point. When admissible, such evidence should be carefully redacted to ensure that irrelevant and inflammatory content is not needlessly presented to the jury.

I.

A.

On November 8, 2005, at approximately 10:30 p.m., Adam Donofrio, a patrolman in Willingboro Township, was dispatched to 103 Rittenhouse Drive to investigate a report of shots fired and a possible injured person. On his arrival, Donofrio observed an individual, later identified as Lamont Peterson, lying partially

3

underneath an SUV. Peterson told Donofrio that he was unable to move his legs and was unsure if he was injured. When Donofrio removed Peterson's clothing to check for injuries, he observed seven bullet holes in Peterson's body: three in Peterson's back, one in Peterson's left arm, one in his chest, one in his upper abdomen, and two in his head. Donofrio took steps to stem the bleeding and called for emergency medical personnel. An ambulance soon arrived, and Peterson was transported to a helicopter pad and flown to Cooper Medical Center. En route to the hospital, Peterson told another officer that defendant, Vonte Skinner,[1] had shot him.

Following the shooting, Peterson initially was reluctant to speak further with the police. He claimed that the "code of the street" was not to "snitch," and he felt he needed to get revenge on his own. However, Peterson eventually agreed to cooperate. He provided the police with a statement explaining that both he and defendant sold drugs for a man named Brandon Rothwell. According to Peterson, defendant joined Rothwell's group two months before the shooting and defendant's job was to be the group's "muscle," handling problems with customers and other drug dealers. Peterson stated that his relationship with Rothwell became strained once defendant was admitted to the

---

[1] Peterson actually stated that "Devonte" was the shooter. "Devonte" is an alias used by defendant.

4

group because Peterson's share of the profits was reduced due to the addition of a new member. Unhappy with the loss in his revenue, Peterson withheld some money that he was supposed to turn over to Rothwell. According to Peterson, after he stopped paying his full share of drug proceeds, Rothwell demanded that Peterson return a TEC-9 firearm that had been provided to him as a group member. Peterson did not return the weapon.

Peterson testified that, on the night of the shooting, he engaged in multiple phone conversations with defendant, who purportedly wanted to set up a drug sale. Peterson agreed to make the sale and to meet, at defendant's suggestion, at Rittenhouse Park in Willingboro at about 10:00 p.m. As the meeting time grew closer, Peterson received several more calls from defendant, who seemed anxious to know Peterson's estimated time of arrival. Peterson claimed that, on arriving at Rittenhouse Park, he saw defendant and Rothwell in bushes located on the side of the street. Defendant allegedly brandished a firearm and began to shoot at Peterson as Peterson was exiting his SUV. Peterson stated that he did not recall trying to run or other details about the encounter, except that he believed that he was dying. Peterson later told the police

that defendant had shot him and that Rothwell had ordered defendant to do so because Peterson owed Rothwell money.[2]

Defendant was questioned by police on November 17, 2005, in connection with the attack on Peterson. Defendant initially denied being near the scene of the crime, but he eventually acknowledged arranging a drug deal with Peterson on the night of the shooting. According to defendant, he was at 103 Rittenhouse Drive, speaking with Peterson, when shots suddenly rang out. When he heard the shots, defendant fled on foot. Defendant also stated that Rothwell was not present at the meeting with Peterson.

Defendant told the police that he had driven a grey Chevy Malibu to Rittenhouse Park and that he abandoned the car after hearing gunshots and running from the scene. The police obtained a warrant to search defendant's car[3] and discovered in it three notebooks filled with rap lyrics authored by defendant. By and large, the rap lyrics contained in defendant's notebooks are profane and violent. Many of the lyrics are written in the

---

[2] Rothwell was initially charged as a codefendant, but the charges against him were dropped because Peterson refused to testify against Rothwell, reportedly because Rothwell is the father of Peterson's cousin's child.

[3] In fact, the car was registered to the mother of defendant's girlfriend.

first person under the moniker "Real Threat," and defendant has the word "Threat" tattooed on his left arm.

Defendant reportedly has composed rap lyrics as a form of self-expression since he was a child. In fact, the record reveals evidence that some of defendant's work had been produced in connection with a rap music label. Although it is not clear when each individual verse of the lyrics found in defendant's notebooks was written, the State concedes that many of the lyrics found in defendant's car and read to the jury were composed long before the circumstances underlying the instant offense took place.

B.

A Burlington County grand jury filed an indictment against defendant on November 16, 2006, charging him with first-degree attempted murder, contrary to N.J.S.A. 2C:5-1(a)(3) and N.J.S.A. 2C:11-3(a)(1); second-degree conspiracy to commit murder, contrary to N.J.S.A. 2C:5-2(a)(1); third-degree unlawful possession of a weapon without a permit, contrary to N.J.S.A. 2C:39-5(b); second-degree possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(a); second-degree aggravated assault, contrary to N.J.S.A. 2C:12-1(b)(1); third-degree aggravated assault with a deadly weapon, contrary to N.J.S.A. 2C:12-1(b)(2); and second-degree possession of a firearm by a convicted person, contrary to N.J.S.A. 2C:39-7(b).

Before trial, defendant objected to the introduction of his rap lyrics into evidence. He requested a preliminary hearing pursuant to N.J.R.E. 104 to contest their admissibility, which the court granted. The court concluded that the lyrics were relevant because they tended to prove the State's theory of the case and that they were admissible under N.J.R.E. 404(b) because the lyrics provided insight into defendant's alleged motive and intent. Accordingly, the court ordered that redacted portions of defendant's rap lyric writings would be admitted into evidence.

Defendant's first trial resulted in a mistrial after the jury was unable to reach a unanimous verdict. Prior to defendant's retrial, he renewed his objection to the admissibility of his rap lyrics; however, the trial court adhered to its previous determination finding the lyrics admissible.

At the second trial, a detective testifying for the State read extensively from defendant's lyrics to the jury. The trial transcript of that uninterrupted reading stretches thirteen pages. The material was replete with expletives and included graphic depictions of violence, bloodshed, death, maiming, and dismemberment. The following excerpts of the pages and pages of verses read to the jury exemplify the general nature of the lyrics admitted against defendant:

8

I'm the n***a to drive-by and tear your block up, leave you, your homey and neighbors shot up, chest, shots will have you spittin' blood clots up. Go ahead and play hard. I'll have you in front of heaven prayin' to God, body parts displaying the scars, puncture wounds and bones blown apart, showin' your heart full of black marks, thinkin' you already been through hell, well, here's the best part. You tried to lay me down with you and your dogs until the guns barked. Your last sight you saw was the gun spark, nothin' but pure dark, like Bacardi. Dead drunk in the bar, face lent over the wheel of your car, brains in your lap, tryin' to comprehend what the f**k just tore you apart, made your brains pop out your skull.

. . . .

On the block, I can box you down or straight razor ox you down, run in your crib with the four pound and pop your crown. Checkmate, put your face in the ground. I'll drop your queen and pawn, f**k -- f**k wastin' around. They don't call me Threat for nothin'.

. . . .

You pricks goin' to listen to Threat tonight. 'Cause feel when I pump this P-89 into your head like lice. Slugs will pass ya' D, like Montana and Rice, that's five hammers, 16 shots to damage your life, leave you f*****s all bloody . . . .

. . . .

In block wars I am a vet. In the hood, I'm a threat. It's written on my arm and signed in blood on my Tech. I'm in love with you, death.

Although the case had nothing to do with women or violence that involved women, the material that the State read to the jury

9

also included depictions of rape and other violent and demeaning treatment of women:

> After you die, I'll go to your Mom's house and f**k her until tomorrow and make ya' little brother watch with his face full of sorrow.
>
> . . . .
>
> So get them answers right.  Where's the case and stash of white.  I got ya wife tied to the bed and at her throat is a knife.

Those verses, along with several more pages not reproduced here, plainly depict various crimes and other bad acts, but those crimes and acts were unconnected to the specific facts of the attempted-murder charge against defendant.  The State did not attempt to clarify or explain the lyrics in any way, despite their heavy use of slang and otherwise esoteric language.

In his defense, defendant advanced a third-party-guilt theory.  He contended that Peterson was shot by another man, Joseph Ward, with whom Peterson had an ongoing dispute.  Ward reportedly had robbed Peterson's cousin shortly before the events giving rise to this appeal.  In response to that robbery, someone related to Peterson fired a gun at Ward's car.  Peterson testified that the "code of the street" therefore required Ward to retaliate against him.  Police found Ward in the area of Rittenhouse Park on the night Peterson was shot.  Furthermore, Alexandria Ross, Peterson's cousin and the mother of Rothwell's

10

child, testified that Peterson had told her that Ward, and not defendant, had shot him; however, Ross's in-court testimony contradicted her previous statements to police, in which she stated that Peterson was shot by defendant. At trial, Peterson acknowledged his dispute with Ward but insisted that defendant, and not Ward, was his assailant.

During closing arguments, the prosecutor compared the "street code" of silence to a "subculture of violence." Specifically, the prosecutor stated that he was "weary because you deal with this sub-culture of violence and because you wonder if this sub-culture at some point is going [to] overtake the regular culture. No snitching and . . . don't talk to the police." The prosecutor also attempted to evoke sympathy for Peterson by depicting him as a fatherless child and stating, "[t]hese guys are just kids with guns. That's all they are. Kids without fathers with guns." Finally, the prosecutor likened the testimony of Alexandria Ross to "a call [for] anarchy." He warned the jury that,

> [i]f you accept Alexandria Ross's testimony, that is a white flag to anarchy. . . . And if you want to surrender to anarchy and listen to Alexandria Ross . . . then you're free to [do] that. And you can take that same hand -- by doing it, you take that same hand and grab it and walk [defendant] to you, walk him to the light of redemption. Walk him to the light of the vindicator. If you feel like that's what you have to do,

> then do that.  But think about what you are
> doing.
>
> The evidence says you should not do that.
> Common sense says you should not do that.
> Lamont Peterson says you should not do that.
> Think about what you are doing.

Defendant did not object to the prosecutor's summation.

The jury convicted defendant of attempted murder, aggravated assault, and aggravated assault with a deadly weapon, and acquitted defendant of all other charges.  After merging the assault and attempted murder convictions, the trial court imposed an aggregate thirty-year sentence with an eighty-five percent parole disqualifier, pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.

The Appellate Division reversed defendant's conviction in an unpublished decision.  The panel concluded, with one judge dissenting, that the admission of defendant's rap lyrics into evidence was reversible error and necessitated a new trial.  The majority primarily expressed concern over the prejudicial impact of defendant's admittedly violent lyrics in an attempted murder trial and, as a result, analyzed the admission of defendant's lyrics under the N.J.R.E. 404(b) framework established in State v. Cofield, 127 N.J. 328, 338 (1992).  In doing so, the majority distinguished this Court's holding in State v. Koskovich, 168 N.J. 448, 484-87 (2001), which admitted into evidence in a capital case lyrics authored by a defendant as proof of a

12

"thrill kill" motive under N.J.R.E. 404(b).  The majority found that, unlike in Koskovich, here there was no genuine dispute over defendant's alleged motive or intent.

A majority of the panel also believed that the State had access to other, less prejudicial, evidence concerning defendant's motive and intent.  In particular, the panel found that defendant's motive was amply demonstrated through Peterson's testimony that Peterson had been skimming profits from Rothwell's business and that defendant was acting as Rothwell's "muscle."  Similarly, the panel concluded that evidence of defendant's rap lyrics was unnecessary to demonstrate intent to kill because the brutal nature of the shooting and Peterson's seven bullet wounds adequately bespoke such intent.  Consequently, the panel concluded that "[t]he only logical relevance [of defendant's lyrics] was to give additional weight to Peterson's testimony."

Finally, addressing defendant's challenge to the State's closing argument, the majority simply noted that the prosecutor's summation exceeded the bounds of permissible advocacy; however, it did not rest the reversal of defendant's conviction on prosecutorial impropriety.

The dissent maintained that the trial court correctly analyzed the four Cofield prongs and properly applied them to this case.  The dissent argued that the introduction of

13

defendant's rap lyrics made the inference of defendant's motive and intent more logical. For that reason, the dissent believed that the lyrics did more than merely bolster Peterson's testimony: "they also explain[ed] why defendant, theoretically part of Rothwell's sales team and a cohort of the victim, would have targeted him." Accordingly, the dissent maintained that the probative value of defendant's rap lyrics easily outweighed their prejudicial effect.

The dissent acknowledged that the trial court's redaction of the lyrics was likely insufficient and that the jury had heard several verses entirely immaterial to the issues in the case. However, it concluded that the impact of the extraneous verses was harmless given their similarity to other relevant lyrics heard by the jury. Finally, the dissent emphasized that the trial court adequately instructed the jury on the permissible use of the lyrics.

Because a member of the Appellate Division panel dissented, the State filed for an appeal as of right, pursuant to Rule 2:2-1(a)(2). In addition, defendant filed a petition for certification with this Court seeking review on several other issues. We granted defendant's petition limited to his claim that the prosecutor exceeded the bounds of permissible advocacy in his closing argument. State v. Skinner, 214 N.J. 174 (2013).

14

We also granted amicus curiae status to the Attorney General and the American Civil Liberties Union of New Jersey.

## II.

### A.

Defendant maintains that the Appellate Division correctly disallowed the admission of his rap lyrics into evidence under N.J.R.E. 404(b) because any probative value of such evidence is outweighed by its potential for prejudice. Defendant emphasizes that N.J.R.E. 404(b) is a rule of exclusion rather than inclusion and notes that, although redacted by the trial court, the lyrics read to the jury were disturbing, violent, and primarily written in the first person. He contends that their admission was highly prejudicial and served no purpose other than to inflame the passions of the jury. Moreover, defendant maintains that depictions of criminal behavior in rap lyrics are largely exaggerated and often convey nothing more than artistic bravado. Without being properly guided through expert testimony, defendant claims that rap lyrics are likely to be misinterpreted and misused by a jury.

Defendant also contends that the prosecutor's closing arguments exceeded the bounds of permissible advocacy and inappropriately urged the jury to "send a message" by convicting defendant. Defendant characterizes the prosecutor's remarks as an impermissible "call to arms" and claims that, by invoking the

15

specter of a culture war, the prosecutor unfairly prejudiced the jury against him.

B.

The State contends that the Appellate Division incorrectly concluded that defendant's rap lyrics were inadmissible because of their capacity to prejudice the jury. Specifically, the State maintains that the Cofield test for the admission of evidence under Rule 404(b) was properly satisfied. The State also notes that in Koskovich this Court similarly admitted an individual's lyrical musings as evidence of motive in a murder trial.

According to the State, the lyrics proffered at defendant's trial are relevant because they shed light on defendant's motive and intent. To that end, the State emphasizes that evidence of motive and intent "require[s] a very strong showing of prejudice to justify exclusion." State v. Covell, 157 N.J. 554, 570 (1999). The State asserts that no such prejudice exists here.

The State also insists that defendant's lyrics were not admitted to establish that he was a "bad person." Rather, it argues that the lyrics elucidate important aspects of disputed matters involving the alleged crime. Noting that defendant's trial strategy was to suggest that defendant had no motive to kill a fellow "team member," and that Ward, rather than defendant, had shot Peterson, the State argues that defendant's

16

motive and intent to kill Peterson were directly in dispute. Because defendant's purported motive was contested at trial, the State maintains that the lyrics penned by defendant do more than corroborate Peterson's testimony; they illuminate defendant's motive and willingness to resort to violence. The State further notes that the jury explicitly was instructed to consider defendant's lyrics only for the limited purpose of establishing motive or intent, and not as substantive evidence of guilt in this particular matter.

Finally, the State disputes that the prosecutor's closing statement exceeded the bounds of permissible advocacy. The State emphasizes that defense counsel never objected to the prosecutor's closing, indicating that the remarks were not perceived as prejudicial at the time. Furthermore, the State relies on the principle that prosecutors are accorded considerable latitude in forcefully summing up their case, so long as the remarks are reasonably related to the scope of the evidence presented.

C.

The Attorney General, appearing as amicus curiae in support of the State, argues that defendant's rap lyrics are not "crimes, wrongs, or acts" within the scope of N.J.R.E. 404(b) and therefore should be analyzed solely for relevance under N.J.R.E. 401. The Attorney General further maintains that the

17

determination of whether evidence is a "crime, wrong, or act" under N.J.R.E. 404(b) must be made independent of the evidence's likely prejudicial effect.  In other words, he contends that the mere fact that evidence is prejudicial to a defendant does not mean that the evidence is necessarily a bad "act" for the purposes of N.J.R.E. 404(b).  Here, the Attorney General asserts that defendant's authorship of profane lyrics does not constitute a crime and that the lyrics therefore should be assessed solely on the basis of relevance.

The Attorney General further notes that "gangsta rap," of the type authored by defendant, is a multi-million dollar industry, often sponsored by major corporations.  The Attorney General notes that rap music is a prevalent form of entertainment throughout the country, despite its frequent references to, and glorification of, violent criminal behavior. Given the prevalence of rap music in today's society, the Attorney General asserts that lyrics such as those of defendant would be unlikely to inflame the passions of a jury or irreparably prejudice defendant.  Additionally, the Attorney General contends that the jury was well instructed on the limited permissible uses of defendant's lyrics and claims that there is no reason to believe that the jury used those lyrics in an inappropriate manner.

D.

The New Jersey Chapter of the American Civil Liberties Union (ACLU) appears in this case as amicus curiae on behalf of defendant. The ACLU asserts that defendant's rap lyrics are a form of artistic expression and thus are entitled to heightened protection under the First Amendment of the United States Constitution and Article I, Paragraph 6 of the New Jersey Constitution. The ACLU emphasizes that defendant's lyrics are not akin to a diary and therefore contain limited probative value. Moreover, because rap lyrics are often a vehicle for social and political commentary, the ALCU argues that admitting defendant's lyrics would run the risk of chilling otherwise valuable speech. Accordingly, the ACLU urges the establishment of a strict guideline against the admissibility of expressive works in a criminal trial, in light of the First Amendment protections ordinarily afforded to such works. It urges that their admissibility should be limited to situations clearly indicating that the author engaged in the crimes about which he or she has written. In the ACLU's view, to hold otherwise would unduly discourage, or even punish, lawful expression.

## III.

### A.

Only once before has this Court had to assess the admission of song lyrics as part of the trial evidence adduced against a defendant. In Koskovich, supra, this Court considered the

19

admission of what appeared to be killing-themed song lyrics found in a notebook that the defendant kept in his bedroom at the time of the offense. 168 N.J. at 484-85. The admission of the violent song lyrics was argued, on appeal, to be error under an N.J.R.E. 404(b) analysis. Id. at 482. In affirming the trial court's evidentiary ruling, we agreed that the lyrics found in defendant's notebook were probative of the State's theory of the case. Ibid. Specifically, we noted that the lyrics were able to shed light on the defendant's motive and intent for an otherwise inscrutable crime, and we evaluated the evidence's prejudicial effect in light of the overwhelming evidence of defendant's guilt. Id. at 485-87.

However, an examination of the factual circumstances surrounding our decision in Koskovich reveals marked differences from the case here. In Koskovich, the defendant and his friend had called a pizzeria and placed an order for delivery to an abandoned home. Id. at 466. When two pizza delivery men arrived, the defendant repeatedly fired his gun at their car, killing both of them. Id. at 467. There was no obvious motive for the shootings, and the State's theory of the case was that defendant merely wanted to "experience the thrill of killing." Id. at 470.

In searching the defendant's bedroom, the police discovered, among other things, a notebook containing what

20

appeared to be song lyrics about killing.  Id. at 472.  Other

items associated with guns and killing also were found in the

same room.  Ibid.  The lyrics read to the jury were short:

"'About killing, people, you can kill by [illegible].  On by

guns, one night you break in, somebody home.  And you take their

money and kill by drive [illegible] down the road and shout, and

shouting.  By the big heads.  The Best.'"  Ibid. (alterations in

original).  The other items associated with guns and killing

found in the bedroom also were introduced into evidence, along

with rather overwhelming evidence of the defendant's guilt.  Id.

at 480.

The defendant was convicted and received a death sentence.[4]

On appeal before this Court, the defendant raised a multitude of

issues, including a challenge under N.J.R.E. 404(b) to the

admission of the lyrics.  Id. at 482.  That rule, entitled

"Other crimes, wrongs or acts," provides as follows:

> Except as otherwise provided by Rule 608(b),
> evidence of other crimes, wrongs, or acts is
> not admissible to prove the disposition of a
> person in order to show that such person
> acted in conformity therewith.  Such
> evidence may be admitted for other purposes,
> such as proof of motive, opportunity,
> intent, preparation, plan, knowledge,
> identity or absence of mistake or accident

---

[4] Defendant's death sentence was set aside by this Court and the matter was remanded for a new penalty phase trial.  Id. at 541-42.  New Jersey's death penalty statute has since been repealed.  L. 2007, c. 204.

21

> when such matters are relevant to a material
> issue in dispute.
>
> [N.J.R.E. 404(b).]

In Koskovich, supra, we noted, preliminarily, that "[t]he State makes a legitimate argument that the items at issue do not represent 'other wrongs' as contemplated by N.J.R.E. 404(b), and thus no analysis is required under that rule." 168 N.J. at 482. The trial court in that case had analyzed the evidence based on the defendant's objection that the song lyrics lacked any probative value. Id. at 480. Nevertheless, we reviewed the evidence based on the asserted Rule 404(b) error raised on appeal. Id. at 482 (explaining our perception of "some basis to consider the implication of [Rule] 404(b)"). The lyrics' admissibility was assessed under that framework, applying the Cofield factors. Id. at 483-87.

Ultimately, we agreed with the trial court that the song lyrics evinced a "sort of obsession with killing people," id. at 480-81, and, as a result, we determined that the trial court did not err in admitting the writings on the contested issue of the defendant's intent, id. at 484-85. We also determined that the lyrics shed light on the defendant's motive -- a desire to experience the thrill of killing -- in an otherwise indecipherable crime. Id. at 481. Importantly, we noted a "logical connection" between the writing of the killing-themed

song lyrics that the defendant kept in his bedroom and the specific facts underlying the killing that occurred in Koskovich.  Id. at 485.  Moreover, given the strong and overwhelming evidence of the defendant's guilt, the prejudicial impact of the lyrics was deemed not so inflammatory as to singlehandedly prejudice the jury against defendant.  Id. at 487.  Accordingly, we upheld the trial court's admission of the lyrics to prove motive and intent, having determined that the lyrics satisfied the stringent test for admission under N.J.R.E. 404(b).  Ibid.  Even assuming that there was "some slight error" in the admission of the disputed lyrics, we found no reversible error in Koskovich because there remained "overwhelming evidence of [the] defendant's guilt."  Ibid.

B.

Following Koskovich's lead, the trial court and the Appellate Division in this matter utilized N.J.R.E. 404(b)'s framework to assess the admissibility of the rap lyrics written by defendant.  Although Koskovich did not purport to establish a universal requirement that lyrics or similar expressive works by a defendant involving themes of criminality must be analyzed under N.J.R.E. 404(b), the courts' decisions to use the N.J.R.E. 404(b) framework in this matter is consistent with the safeguard that the rule provides.

23

It has oft been recognized that "[t]he underlying danger of admitting other-crime [or bad-act] evidence is that the jury may convict the defendant because he is 'a "bad" person in general.'" Cofield, supra, 127 N.J. at 336 (quoting State v. Gibbons, 105 N.J. 67, 77 (1987)).  For that reason, any evidence that is in the nature of prior bad acts, wrongs, or, worse, crimes by a defendant is examined cautiously because it "'has a unique tendency'" to prejudice a jury.  State v. Reddish, 181 N.J. 553, 608 (2004) (quoting State v. Stevens, 115 N.J. 289, 302 (1989)); see also State v. Hernandez, 170 N.J. 106, 123 (2001) ("Studies confirm that the introduction of a defendant's prior bad acts 'can easily tip the balance against the defendant.'" (quoting State v. Terrazas, 944 P.2d 1194, 1198 (Ariz. 1997))).  Put simply, a defendant must be convicted on the basis of his acts in connection with the offense for which he is charged.  A defendant may not be convicted simply because the jury believes that he is a bad person.  Because N.J.R.E. 404(b) guards against the wholly unacceptable prospect that a jury might become prejudiced against a defendant based on earlier reprehensible conduct, the rule "is often described as [one] of exclusion."  State v. Rose, 206 N.J. 141, 179-80 (2011).

In Cofield, supra, a four-part test was established "to avoid the over-use of extrinsic evidence of other crimes or

24

wrongs" pursuant to a Rule 404(b) exception. 127 N.J. at 338.

The framework announced in Cofield requires that:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Ibid. (quoting Abraham P. Ordover, Balancing the Presumptions of Guilt and Innocence: Rules 404(b), 608(b), and 609(a), 38 Emory L.J. 135, 160 (1989)).]

Those standards have been explicated through their application.

In respect of the first Cofield prong, "the evidence of the prior bad act, crime, or wrong must be relevant to a material issue that is genuinely disputed." Covell, supra, 157 N.J. at 564-65. The analysis can include all "evidentiary circumstances that 'tend to shed light' on a defendant's motive and intent or which 'tend fairly to explain his actions,' even though they may have occurred before the commission of the offense." Id. at 565 (quoting State v. Rodgers, 19 N.J. 218, 228 (1955)). However, the evidence must relate to a material issue that is in dispute, and the State's need for the evidence is a consideration when weighing relevance under prong one. A court must "'consider whether the matter was projected by the defense as arguable

25

before trial, raised by the defense at trial, or was one that the defense refused to concede.'"  Rose, supra, 206 N.J. at 160 (quoting State v. P.S., 202 N.J. 232, 256 (2010)).

The second prong, which requires that the other-crime evidence be similar in kind and reasonably close in time to the alleged crime, is implicated only in circumstances factually similar to Cofield.  See, e.g., State v. Gillispie, 208 N.J. 59, 88-89 (2011) (noting that second Cofield prong need not receive universal application); State v. Williams, 190 N.J. 114, 131 (2007) (finding that second Cofield prong is "limited to cases that replicate the circumstances in Cofield").  Its application is not relevant in the instant analysis.  Cf. State v. Barden, 195 N.J. 375, 389 (2008) (declining to apply second Cofield prong where it "serve[d] no beneficial purpose" (internal quotation marks omitted)).

The third Cofield prong "requires that the judge serve as gatekeeper to the admission of other-crime evidence" and ensure that proof of the prior bad act is demonstrated by clear and convincing evidence.  Hernandez, supra, 170 N.J. at 123; accord Gillispie, supra, 208 N.J. at 89.

Finally, the fourth Cofield prong requires that "[t]he probative value of the evidence must not be outweighed by its apparent prejudice."  Cofield, supra, 127 N.J. at 338 (internal quotation marks omitted).  As noted in Covell, supra, "[s]ome

types of evidence require a very strong showing of prejudice to justify exclusion.  One example is evidence of motive or intent."  157 N.J. at 570; cf. State v. Mulero, 51 N.J. 224, 228-29 (1968).  Nevertheless, in weighing the potential prejudice of a defendant's prior bad act, crime, or wrong, consideration must be given to whether other, less prejudicial, evidence is available to the State.  See Stevens, supra, 115 N.J. at 303; see also Gillispie, supra, 208 N.J. at 90-91 ("In the weighing process, the court should also consider the availability of other evidence that can be used to prove the same point." (internal quotation marks omitted)).

Finally, if the State adequately "demonstrate[s] the necessity of the other-crime evidence to prove a genuine fact in issue and the court has carefully balanced the probative value of the evidence against the possible undue prejudice it may create, the court must instruct the jury on the limited use of the evidence."  Cofield, 127 N.J. at 340-41.

That framework for a Rule 404(b) analysis guides this review of defendant's challenge to the admissibility of his rap lyrics in his criminal trial.

IV.

While the direct parties to this appeal -- the State and defendant -- acquiesce to analyzing this case under the rubric of Rule 404(b), there is a debatable question whether artistic

27

expression about crimes or bad acts should be evaluated under N.J.R.E. 404(b) at all. In other words, can the act of writing about a crime or bad act be a bad act itself?

The Attorney General as amicus argues that defendant's rap lyrics are not "crimes, wrongs, or acts" under N.J.R.E. 404(b) and therefore should be analyzed solely for relevance under N.J.R.E. 401. Its position enjoys some support. See, e.g., Joynes v. State, 797 A.2d 673, 677 (Del. 2002) (concluding that authorship of rap lyrics is not "bad act" within meaning of Rule 404(b) and therefore should be governed by relevance standard).

To be sure, writing rap lyrics -- even disturbingly graphic lyrics, like defendant's -- is not a crime. Nor is it a bad act or a wrong to engage in the act of writing about unpalatable subjects, including inflammatory subjects such as depicting events or lifestyles that may be condemned as anti-social, mean-spirited, or amoral. However, the very "'purpose of Rule 404(b) is simply to keep from the jury evidence that the defendant is prone to commit crimes or is otherwise a bad person, implying that the jury needn't worry overmuch about the strength of the government's evidence.'" Rose, supra, 206 N.J. at 180 (quoting United States v. Green, 617 F.3d 233, 249 (3d Cir.) (internal quotation marks omitted), cert. denied, __ U.S. __, 131 S. Ct. 363, 187 L. Ed. 2d 334 (2010)); see also State v. Moore, 113 N.J. 239, 275 (1988) ("The danger that [N.J.R.E. 404(b)] seek[s]

to prevent is that a defendant will be prejudiced by evidence of other acts such that a jury will convict because he or she is a bad person disposed to commit crime.").

Rule 404(b) serves as a safeguard against propensity evidence that may poison the jury against a defendant. Violent, degrading rap lyrics, of the type authored by defendant, have the capacity to accomplish just that. Not all members of society recognize the artistic or expressive value in graphic writing about violence and a culture of hate and revenge. Thus, the purpose of N.J.R.E. 404(b) is advanced by its application in a setting such as this.[5]

Furthermore, our analysis in Koskovich, supra, recognized the value of using the Rule 404(b) approach even where the evidence sought to be admitted is "not overtly criminal in nature." 168 N.J. at 483. Specifically, we noted that the lyrical evidence admitted in Koskovich "was somewhat analogous and similar in nature to the evidence admitted in State v.

---

[5] Of course, rap lyric evidence that provides direct proof against a defendant -- such as an admission or details that are not generally known and dovetail with the facts of the case -- should be analyzed for relevance under N.J.R.E. 401 and evaluated under N.J.R.E. 403's standard for prejudice, and not the standard for prejudice under a Cofield analysis. Cf. Rose, 206 N.J. at 180 (recognizing intrinsic nature of evidence that "directly proves" charged offense as excluded from Rule 404(b)'s analytic framework). A jury need not be shielded from a defendant's confession simply because it is conveyed in a rap or other artistic setting.

Covell . . . and State v. Crumb." Id. at 485. In State v. Crumb, the Appellate Division acknowledged that lawful, constitutionally protected acts "nonetheless may be interpreted by a jury to constitute other wrong acts." 307 N.J. Super. 204, 231 (App. Div. 1997), certif. denied, 153 N.J. 215 (1998). And in Covell, supra, we explained that "[a]lthough being sexually attracted to young girls in and of itself is not a crime, a jury may interpret [a] defendant's expression of those feelings to be a wrong or bad act." 157 N.J. at 568. Those citations demonstrate our previous recognition that certain expressive actions, which are not overtly criminal but can be perceived as wrong or bad, can persuade a jury of a defendant's guilt, regardless of the evidence proffered by the State. Cf. Koskovich, 168 N.J. at 484.

Finally, this appeal comes before us on the basis of a Rule 404(b) objection by defendant to the use of his rap lyrics against him. The trial court and Appellate Division used a Rule 404(b) framework in weighing the prejudicial effect of the disputed evidence against its probative value. That approach was consistent with prior law and the underlying purpose of Rule 404(b). Furthermore, there was no argument by the State that the rap lyrics constituted direct evidence of the offense involved in this matter. The lyrics were advanced for the purposes of proving motive and intent under Rule 404(b).

30

Accordingly, we will engage in a like analysis as our starting point. In doing so, we note that other jurisdictions also have approached the admissibility of a defendant's prejudicial lyrical compositions using a Rule 404(b) framework. See, e.g., State v. Hannah, 23 A.3d 192, 196-201 (Md. 2011); State v. Cheeseboro, 552 S.E.2d 300, 312-13 (S.C. 2001).

V.

A.

To assess the admissibility of defendant's rap lyrics under N.J.R.E. 404(b), we turn to each of the Cofield prongs.[6]

The first Cofield prong requires that the other crime, wrong, or bad-act evidence pertain to a material issue in dispute. Covell, supra, 157 N.J. at 564-65. At trial, the State suggested that defendant's lyrics provided valuable insight into defendant's alleged motive and intent to kill Peterson. We agree with the State that, in this case, defendant's motive was genuinely in dispute; however, the State had evidence other than defendant's rap lyrics that it advanced on that score. Indeed, Peterson's testimony explicitly laid out for the jury the role that defendant played as the "muscle" in a

---

[6] The second prong, which requires that the other-crime evidence be similar in kind and reasonably close in time to the alleged crime, is implicated in circumstances factually similar to Cofield. That prong is not implicated in these circumstances. Therefore, we do not address it in our analysis.

31

three-person drug operation, in which Peterson had begun to skim money from Rothwell.  Peterson also testified that he had argued with Rothwell and had refused to return the nine-millimeter weapon that he had received as a member of Rothwell's drug team. In fact, we note that, in the State's opening, the prosecution asserted that defendant's "motive was to enforce the street laws against [Peterson], and his intent was to kill him."

The effect of defendant's rap lyrics was simply to bolster the State's motive theory, which was already supported by Peterson's testimony that defendant was the enforcer for Rothwell, who was being cheated by Peterson.  As the Appellate Division succinctly stated, "[t]o the extent the lyrics depicting defendant as an enforcer and hit-man had any relevance beyond demonstrating his criminal propensity and depravity, it was to add weight to Peterson's testimony that defendant played that role for Rothwell."  This Court has repeatedly discouraged the use of other-crime evidence merely to bolster the credibility of a testifying witness.  See, e.g., State v. Darby, 174 N.J. at 520-21 (2002) (stating Cofield standard is rendered meaningless if "other-crime evidence is admissible merely to support the credibility of a witness"); P.S., supra, 202 N.J. at 256 (noting "other-crimes evidence should not be admitted solely to bolster the credibility of a witness against a defendant").

32

As for intent, defendant did not advance any evidence calling into question that Peterson's shooter had intended to kill him. The sheer number of times and places that Peterson was struck with bullets -- seven shots in total to his torso, head, and neck -- certainly provided the State with strong evidence of an intent to kill. Intent was therefore not in dispute. Defendant merely asserted that he was not the shooter, and the State did not advance the rap lyrics evidence for the purpose of identity. Thus, while the identity of the shooter was in issue, the shooter's intent was not.

Furthermore, defendant's rap lyrics only bear on the material and disputed issue of motive if one believes that those lyrics, many of which were written long before the time of Peterson's shooting, specifically relate to defendant's motive on the evening Peterson was shot and almost killed. The third Cofield prong requires that proof of the prior-crime evidence be demonstrated by clear and convincing evidence. See Hernandez, supra, 170 N.J. at 123. Yet, there was no evidence that the crimes and bad acts about which defendant wrote in rap form were crimes or bad acts that he in fact had committed. Indeed, there is an utter absence of clear and convincing evidence, as required under prong three of Cofield, that defendant engaged previously in any of the events portrayed in his rap lyrics.

The lyrics can only be regarded as fictional accounts. The State has produced no evidence otherwise.

Most importantly, the fourth <u>Cofield</u> prong requires that the probative value of the lyrics not be outweighed by their prejudicial effect. We before quoted at length several verses of defendant's rap lyrics, chosen because they exemplified the lyrics' glorification of violence and death, and defendant's apparent disregard for human suffering. More pointedly, the Appellate Division appropriately singled out a portion that particularly might have prejudiced the jury against defendant because of its apparent similarity to the type of shooting inflicted on Peterson:

> To illustrate the risk of extreme prejudice, we refer to a portion of [a] lyric . . . "Got Beef, I can spit from a distance for instance; a [person] wouldn't listen so I hit him with the Smithern; hauled off 15 rounds, seven missed him; Two to the mask and six to the ribs, lifted and flipped him." This lyric describes a shooting resembling Peterson's in that it involved multiple gun shots delivered to the head, "the mask," and chest, "the ribs," and the shooting was motivated by the victim's failure to listen. The jurors were left to speculate that defendant had done such things even though there was no evidence to suggest that his writing was anything other than fiction.

In this case, defendant's graphically violent rap lyrics could be fairly viewed as demonstrative of a propensity toward committing, or at the very least glorifying, violence and death.

34

That prejudicial effect overwhelms any probative value that these lyrics may have. In fact, we detect little to no probative value to the lyrics whatsoever. The difficulty in identifying probative value in fictional or other forms of artistic self-expressive endeavors is that one cannot presume that, simply because an author has chosen to write about certain topics, he or she has acted in accordance with those views. One would not presume that Bob Marley, who wrote the well-known song "I Shot the Sheriff," actually shot a sheriff, or that Edgar Allan Poe buried a man beneath his floorboards, as depicted in his short story "The Tell-Tale Heart," simply because of their respective artistic endeavors on those subjects. Defendant's lyrics should receive no different treatment. In sum, we reject the proposition that probative evidence about a charged offense can be found in an individual's artistic endeavors absent a strong nexus between specific details of the artistic composition and the circumstances of the offense for which the evidence is being adduced.

B.

Our approach is in accord with other jurisdictions that have considered similar questions. For example, in Greene v. Commonwealth, 197 S.W.3d 76, 86-87 (Ky. 2006), cert. denied, 549 U.S. 1184, 127 S. Ct. 1157, 166 L. Ed. 2d 1001 (2007), the Supreme Court of Kentucky admitted into evidence the defendant's

35

homemade video, in which he rapped for nearly seven minutes about murdering his wife. The defendant claimed that the evidence should have been excluded under Kentucky's analogue to Rule 404(b), but the Supreme Court of Kentucky disagreed. Id. at 87. The court held that the defendant's video was admissible because the defendant was rapping about the very crime for which he was being charged. Ibid. Accordingly, the Kentucky Supreme Court held that Kentucky's Rule 404(b)'s prohibition against evidence of other crimes was not implicated. Ibid.

Similarly, in Bryant v. State, 802 N.E.2d 486, 498 (Ind. Ct. App.), transfer denied, 822 N.E.2d 968 (Ind. 2004), the State of Indiana sought to introduce a defendant's rap lyrics as proof of intent in his murder trial. The defendant was charged with the murder of his stepmother, who was found in the trunk of the defendant's car. Id. at 492. The lyrics penned by the defendant -- "[c]uz the 5-0 won't even know who you are when they pull yo ugly ass out the trunk of my car" -- were admitted as proof of motive because of their substantial similarity with the alleged crime. Id. at 498. The court noted that the lyrics were particularly relevant because the defendant claimed that someone else had done the killing. Id. at 499.

Unlike here, the lyrics admitted in Greene and Bryant exhibited an unmistakable factual connection to the charged crimes. Had defendant in this case rapped for seven minutes

36

about murdering a man named "Peterson," or described in his rap lyrics the exact manner in which Peterson was to be killed, his writings would obviously hold more probative value.  But absent such a strong nexus to defendant's charged crime, his fictional expressive writings are not properly evidential.

Our sister jurisdictions rarely have admitted a defendant's rap lyric compositions into evidence without a demonstration of a strong nexus between the subject matter of the lyrics and the underlying crime.  See, e.g., Hannah, supra, 23 A.3d at 196-201 (excluding defendant's rap lyrics); Cheeseboro, supra, 552 S.E.2d at 312-13 (same); State v. Hanson, 731 P.2d 1140, 1144-45 (Wash. Ct. App.) (reversing conviction where prosecution improperly questioned defendant about violent but fictional writings), review denied, 108 Wash. 2d 1003 (1987).

In Hannah, supra, the Maryland Court of Appeals concluded that rap lyrics, authored by the defendant and offered into evidence by the State, "served no purpose other than the purpose of showing the [defendant] has a propensity for violence."  23 A.3d at 202.  The Maryland court distinguished the defendant's fictional rap lyrics from the type of "artistic" material involved in cases like Bryant and Greene, stating that, unlike in those cases, "there is no evidence that [the defendant's] lyrics are autobiographical statements of historical fact."  Id. at 197.  Accordingly, the court concluded that the prejudicial

impact to the defendant from the introduction of his rap writings was overwhelming; the conviction was therefore reversed and the matter was remanded for a new trial.  Id. at 202.

In Cheeseboro, supra, the Supreme Court of South Carolina found that the minimal probative value of the defendant's lyrics was outweighed by their unfair prejudicial impact because the jury could perceive them as evidence of the defendant's violent character.  552 S.E.2d at 313.  The court further noted that "these lyrics contain only general references glorifying violence," rather than evidence of specific criminal acts.  Ibid.  As a result, the court held that the lyrics should have been excluded.  Ibid.

In Hanson, supra, a Washington appellate court rejected "the proposition that an author's character can be determined by the type of book he writes."  Id. at 1145.  The court reversed the defendant's conviction based on the prosecution's improper questioning of the defendant about his violent, fictional writings.  Id. at 1144-45.  However, in a footnote, the court noted that "[t]here may be instances when a defendant's fictional writings would be admissible. . . .  In this case, the State never indicated how the defendant's writings were logically relevant under [Rule] 404(b)."  Id. at 1144 n.7.

In sum, it is clear that other jurisdictions rarely admit artistic works against a criminal defendant where those works

38

are insufficiently tethered to the charged crime.  The upshot to this approach is that, without a strong connection to the attempted murder offense with which defendant was charged, the admission of defendant's rap lyrics risked unduly prejudicing the jury without much, if any, probative value.

C.

N.J.R.E. 404(b) analyses are fact-sensitive.  Their outcomes depend on the evidence proffered and the facts and nature of the case against the defendant.  The recitation of cases from other jurisdictions reflects the difficulty of pronouncing a hard and fast rule to govern the admission of rap lyrics.  That said, extreme caution must be exercised when expressive work is involved, particularly when such expression involves social commentary, exaggeration, and fictional accounts.

In this instance, we are persuaded that the Appellate Division correctly reversed defendant's conviction. We hold that the violent, profane, and disturbing rap lyrics that defendant wrote constituted highly prejudicial evidence against him that bore little or no probative value on any motive or intent behind the attempted murder offense with which he was charged.  Less prejudicial evidence was available to the State on both motive and intent.  The admission of defendant's rap writings bore a high likelihood of poisoning the jury against

39

defendant, notwithstanding the trial court's limiting instruction.

The use of the inflammatory contents of a person's form of artistic self-expression as proof of the writer's character, motive, or intent must be approached with caution. Self-expressive fictional, poetic, lyrical, and like writings about bad acts, wrongful acts, or crimes generally should not be deemed evidential unless the writing bears probative value to the underlying offense for which a person is charged and the probative value of that evidence outweighs its prejudicial impact. In the weighing process, the trial court should consider the existence of other evidence that can be used to make the same point. If admitted, courts are cautioned to redact such evidence with care. In conclusion, we hold that rap lyrics, or like fictional material, may not be used as evidence of motive and intent except when such material has a direct connection to the specifics of the offense for which it is offered in evidence and the evidence's probative value is not outweighed by its apparent prejudice.

VI.

Because our holding based on the introduction of defendant's rap lyrics will require his retrial, we add only this in respect of defendant's claim of prosecutorial excess in summation. On retrial, the State is cautioned that a

40

prosecutor's summation should not employ language designed to stoke a jury's fear for the future of its community or make an inflammatory argument akin to a "call to arms." State v. Marshall, 123 N.J. 1, 161 (1991) (disapproving inflammatory and highly emotional appeals in State closing argument), cert. denied, 507 U.S. 929, 113 S. Ct. 1306, 122 L. Ed. 2d 694 (1993); State v. Knight, 63 N.J. 187, 193 (1973) (disapproving summation that urges jury to respond to "serious" societal unrest); State v. Goode, 278 N.J. Super. 85, 89-90 (App. Div. 1994) (addressing improper "call to arms" that urged jurors to "make a difference in [their] community").

## VII.

The judgment of the Appellate Division is affirmed.

CHIEF JUSTICE RABNER; JUSTICES ALBIN, PATTERSON, and FERNANDEZ-VINA; and JUDGE RODRÍGUEZ (temporarily assigned) join in JUSTICE LaVECCHIA's opinion. JUDGE CUFF (temporarily assigned) did not participate.

41

SUPREME COURT OF NEW JERSEY

NO.   A-57/58               SEPTEMBER TERM 2012
ON APPEAL FROM     Appellate Division, Superior Court



STATE OF NEW JERSEY,

      Plaintiff-Appellant
      and Cross-Respondent,

          v.

VONTE L. SKINNER,

      Defendant-Respondent
      and Cross-Appellant.



DECIDED        August 4, 2014
          Chief Justice Rabner               PRESIDING
OPINION BY        Justice LaVecchia
CONCURRING/DISSENTING OPINION BY
DISSENTING OPINION BY

| CHECKLIST | AFFIRM | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | ---------------------- | ---------------------- |
| | 6 | |

1