Filed 8/2/17

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C075295 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F09592) |
| v. | |
| RAVINESH SINGH, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Sacramento County, Maryanne G. Gilliard, Judge. Affirmed.

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part III.

1

Defendant Ravinesh Singh appeals from his conviction of first degree murder. He contends the trial court erred by (1) admitting into evidence handwritten rap lyrics found in his home; (2) permitting the alternate jurors to hear the court reporter read back testimony to the jury; and (3) denying his motion for new trial made on the basis of new exculpatory evidence. We disagree with each of defendant's contentions and affirm the judgment.

FACTS

Darnell Dabney and codefendant Tony Van sold marijuana in 2008. Van had provided Dabney with a cell phone in order to sell drugs. On the evening of October 13, 2008, Van spoke with Dabney by phone and agreed to bring him some marijuana to sell. Dabney lived at the home of his friend, Michael Pulido, and told Van he was there. Van called Dabney when he arrived at the Pulido home. He arrived driving a white Acura with Lamborghini-type doors. He parked the car across the street from the Pulido home, with the driver's side facing the home.

After receiving Van's call, Dabney went out of the house and walked to the car. Van was seated in the driver's seat, and defendant was seated in the front passenger seat. Dabney spoke with Van about the marijuana, getting Van his money, and going together to commit a burglary.

Defendant asked Dabney who was at the house. Dabney named the people, including a person Dabney called "Joe from the flats," later identified as Joseph Montoya. Defendant asked to see Joe's face.

Dabney walked up to Montoya, who was standing outside with others on the driveway. He asked Montoya if he could talk with him, and he led him to the end of the driveway so defendant could see Montoya's face from the car. They talked about Montoya getting some pills for a friend of Dabney's. Montoya made a phone call and then let Dabney know how the deal would work.

2

By that time, defendant had exited the car and walked up to Dabney's left. Someone said, "[H]ey, Joe." Dabney and Montoya looked up, and defendant shot Montoya in the face. After Montoya fell to the ground, defendant stood over him and shot him three more times; near his belly button, in his left groin, and in his penis. The gunshot to the face was "an immediately fatal injury."

Defendant ran back to the car and told Dabney to get in the car. Dabney got in the backseat, defendant got in the front, and Van drove them away. Defendant told Dabney he shot Montoya because a few years earlier, Montoya had participated in a drive-by shooting on his house, and his cousin and his dog were shot.

Dabney recognized the gun defendant used as a Baretta nine-millimeter owned by Van. Van kept the gun in his car. Defendant disassembled the gun and wrapped it in a T-shirt. The trio stopped along the Sacramento River, and Dabney threw the gun in the river.

They drove to defendant's home in Rio Linda. Defendant told Dabney to take off his clothes so he could burn them. He burned Dabney's and his own clothes on an outdoor grill. Defendant asked his neighbor, Robert Starnes, if he could store Van's Acura in Starnes's garage. He told Starnes he had just shot a guy named Joseph and he was leaving town. Soon after, the three men left defendant's home in defendant's car, picked up two more people, and drove to Seattle. Along the way, defendant threatened to kill the youngest family member of any person who told on him.[1]

Cell phone records showed Van's two phones, the one he possessed and the other that Dabney possessed, were in the vicinity of the crime scene around the time of the

---

[1] Officers arrested Dabney in Seattle approximately two months after the murder. Three years later, Dabney told police defendant shot Montoya. Officers arrested defendant the next day. Dabney testified at trial in exchange for protection and a reduced charge. He pleaded guilty to being an accessory after the fact.

murder. The records also showed the phone Van possessed was near the Freeport Bridge over the Sacramento River approximately five minutes after the murder. About 30 minutes later, calls were made from that phone from Rio Linda. After the last call at about 11:46 p.m., the next phone call happened about seven hours later and was routed through Portland, Oregon.

Officers obtained surveillance video from a camera installed on the Freeport Bridge. The video showed that at around 10:18 p.m. the night of the murder, a white Acura crossed the bridge. The license plate on the car could be identified in the video. Van was known to have been driving a white Acura with the same license plate during this period of time. The video showed at least two people in the car.

Following trial, a jury convicted defendant of first degree murder and found true a firearm use enhancement. (Pen. Code, § 187, subd. (a), Pen. Code, former § 12022.53, subd. (d); The trial court sentenced defendant to an aggregate state prison term of 50 years to life; 25 years to life for murder and another 25 years to life for the enhancement.[2]

DISCUSSION

On appeal, defendant contends the trial court: (1) violated his right to a fair trial by admitting handwritten rap lyrics found in defendant's home that he claims were irrelevant and unduly prejudicial; (2) violated his jury trial rights when it permitted the alternate jurors to hear the court reporter read back Dabney's testimony to the jury; and (3) abused its discretion when it denied defendant's motion for new trial made on the basis of new exculpatory evidence; a declaration by Van written after the verdict.

We address and reject each contention.

---

[2]    The jury acquitted Van of murder but found him guilty of being an accessory. (Pen. Code, § 32.) Van appealed, but his appeal was later dismissed. (C074943.)

4

# I

## *Admission of Rap Lyrics*

When officers searched defendant's home in 2011, they found handwritten rap lyrics that described criminal behavior similar to how defendant killed Montoya. Officers found a page of lyrics inside a storage bin that contained bank statements, documents and other mail addressed to defendant. They also found notebooks containing lyrics inside a microwave oven. The trial court admitted some of the lyrics into evidence to show intent and motive. Defendant contends the trial court violated his rights to due process and a fair trial by admitting the lyrics because the lyrics were irrelevant and unduly prejudicial. We disagree. The lyrics were relevant and not prejudicial. Even if the court erred by admitting them, the error was harmless.

### A.  *Background information*

Defendant filed an in limine motion to exclude the handwritten lyrics. He contended there was no foundation as to who wrote them and when they were written. He also argued their admission was unduly prejudicial under Evidence Code section 352.

The trial court held an Evidence Code section 402 hearing for the prosecution to authenticate the lyrics. Elena Sophia Rios-Singh, defendant's wife, testified for the prosecution. She and defendant married after he was arrested. They had lived together off and on for years before then. She recognized defendant's handwriting on the cover of one of the notebooks that contained lyrics. However, she testified she did not recognize the handwriting inside any of the recovered notebooks except at least one note that she wrote. The trial court did not find Rios-Singh to be credible, and it found the prosecution had not authenticated the writings.

A few weeks later, the trial court convened a second Evidence Code section 402 hearing for authenticating the writings. Joseph Merydith, a questioned document examiner for the California Department of Justice, testified for the prosecution. Merydith

5

compared two bills of sale known to have been signed by defendant with the handwritten lyrics. Although there were some limitations with the examination, he concluded there were "indications that the subject authored the questioned writings." Merydith could not definitively state defendant wrote the lyrics, but he found "many similarities between the two bodies of writing." The trial court ruled the bills of sale were genuine and the writings could go to the jury to determine whether defendant wrote the lyrics.

Defendant then argued the lyrics were unduly prejudicial under Evidence Code section 352. He contended the lyrics were inflammatory and graphic. There also was no evidence of when the lyrics were written. Additionally, defendant argued the lyrics were not unique. He introduced evidence of rap lyrics he found on the Internet that were similar in nature to those attributed to him. He argued the lyrics found at his house were not relevant if they simply were consistent with their genre.

The trial court admitted only those lyrics it found closely mirrored the facts of this case. It ruled the evidence was relevant on the issues of intent and motive. It stated it was of no importance when the lyrics were written, as there was evidence of a long-standing animus between defendant and the victim.

The court also found the lyrics were substantially more probative than prejudicial. The lyrics corroborated the testimony of Dabney and Starnes that defendant was the shooter. The court stated it minimized the lyrics' prejudicial effect by limiting the number and scope of what would be presented to the jury. Defendant could also question any appropriate witness with the lyrics he found on the Internet.

During trial, Detective Hanspeter Merten of the Sacramento Police Department testified concerning the lyrics. He collected the lyrics at defendant's home because some of them looked relevant to the case. Two lines of lyrics read: "two to the gut, watch you shut your eyes slow." This lyric appeared significant to Detective Merten because the victim was shot in the stomach area.

6

Inside a notebook, Detective Merten found these lyrics: "Niggas start to shake when they see me come. You know what it is, a 211." Merten stated "211" refers to the Penal Code section for robbery.

Detective Merten read other lyrics: "shot before I shoot my gun. . . . I shoot for fun just to watch niggas shake like they goin' dumb. Put two in your chest, now you goin' numb." "The clip holds about a million. Put it in your face and melts in your mouth like an M&M." Merten found these lyrics to be significant to the case.

Another lyric: "Like an alarm I'll wake your game up and put two in your head with the stainless, get your life terminated." Detective Merten was aware the victim in this case was shot in the face.

On cross-examination, defense counsel showed Detective Merten rap lyrics he found on the Internet that contained terms similar to those found in defendant's home, such as "face melt." Counsel asked Merten if he could concede such terms were common in "gangsta rap." Merten could not, as he did not listen to rap and did not know if they were common terms. Counsel asked Merten if he did any followup to see whether the phrases used in the lyrics found in defendant's home were common in "gangsta rap." He did not.

During her closing argument, the prosecutor stated the lyrics corroborated the evidence of defendant's intent. She repeated the written lyrics that were similar to the facts of the case. To show the lyrics reflected defendant's intent, she argued defendant wrote them, as opposed to printing them from the Internet, and they were important to him, as he kept them in a secure place with other important documents.

No limiting instruction regarding the lyrics was requested or given.

B.      *Analysis*

        1.      *Relevance*

First, we conclude the trial court did not abuse its discretion when it determined the lyrics were relevant evidence. Evidence is relevant if it has "any tendency in reason

to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Here, defendant's intent and identity were at issue, and the lyrics provided circumstantial evidence that he intended to and did in fact kill Montoya.

All sorts of statements by a defendant can show motive, intent, and identity. For example, in *People v. Lang* (1989) 49 Cal.3d 991, the Supreme Court affirmed the trial court's admission of a defendant's statement, when asked approximately one month before a murder why he carried a gun, that, " 'I'll waste any mother fucker that screws with me.' " (*Id.* at p. 1013.) The statement provided circumstantial evidence the killing was intentional and was not made in self-defense. (*Id.* at p. 1015.)

Similarly, in *People v. Rodriguez* (1986) 42 Cal.3d 730, the Supreme Court affirmed the trial court's admission of witnesses' testimony that, at various times in the months preceding defendant's murder of two California Highway Patrol officers who had pulled him over, they heard the defendant "express contempt and hatred for police and declare that he would kill any officer who attempted to arrest him." (*Id.* at p. 756.) The high court ruled the statements were relevant, and it rejected the defendant's contention that the statements were introduced in violation of Evidence Code section 1101 to prove his disposition. The court stated: "A defendant's threat against the victim . . . is relevant to prove intent in a prosecution for murder. [Citation.] The statements here in question did not specify a victim or victims but were aimed at any police officer who would attempt to arrest appellant. Such a generic threat is admissible to show the defendant's homicidal intent where other evidence brings the actual victim within the scope of the threat. [Citations.]" (*People v. Rodriguez, supra*, at p. 757.)

Rap lyrics written by a defendant may be relevant to establish contested issues of fact, including intent. In *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*), the Court of Appeal upheld the trial court's admission of rap lyrics that were found in a defendant's home. The defendant was convicted of second degree murder, and criminal street gang enhancements were found to be true. Officers found the lyrics three weeks

8

after the crime. They were handwritten and, using gang monikers and nicknames, referred to defendant as their composer. They referenced gang membership and violence against the gang's rivals. (*Id*. at p. 1372 & fn. 3.) Defendant contended the prosecutor did not authenticate the lyrics sufficiently. The appellate court disagreed and, of relevance here, stated the date when defendant wrote the lyrics was not significant: "Both the content and location of these papers identified them as the work of [the defendant]. [Citations.] . . . [T]his was not a case in which the date of creation of the work was critical. Regardless of whether these lyrics were written before or after the killing, they were adequately authenticated as the work of [the defendant]. As such, they demonstrated his membership in Southside, his loyalty to it, his familiarity with gang culture, and, inferentially, his motive and intent on the day of the killing. The trial court properly admitted them, carefully limiting them to those purposes." (*Olguin, supra,* 31 Cal.App.4th at p. 1373.)

This court reached a similar decision in *People v. Zepeda* (2008) 167 Cal.App.4th 25 (*Zepeda*). In that case, the jury convicted the defendant of murdering two members of a rival gang, and it imposed criminal street gang enhancements. We affirmed the trial court's allowing the prosecution to play for the jury two tracks from a "gangster rap" CD the defendant had written and to provide the jury with the lyrics. Citing *Olguin,* we concluded the lyrics were "probative of defendant's state of mind and criminal intent, as well as his membership in a criminal gang and his loyalty to it. The songs showed that defendant's gang had the motive and intent to kill Sureños. This evidence, although anticipatory, was explicitly relevant to the charges against defendant." (*Zepeda, supra,* 167 Cal.App.4th at p. 35.)

We further noted in *Zepeda* that "[w]hile lyrics and poems do not often establish their author's true state of mind (see, e.g., *In re George T.* (2004) 33 Cal.4th 620, 636-639 [lyrics of particular poem, with its ambiguity and lack of incriminating circumstances, did not amount to a criminal threat]), the gang expert here testified that

gangs communicate through music. Defendant's communications here were not ambiguous or equivocal. These lyrics, coupled with the other evidence of defendant's gang membership and his animosity towards Sureños, go beyond mere fiction to disclosing defendant's state of mind, his motives and intentions, and his fealty to furthering his criminal gang's activities." (*Zepeda, supra,* 167 Cal.App.4th at p. 35.)

As in *Zepeda*, defendant's lyrics here go beyond mere artistic expression and, when viewed in light of the incriminating circumstances, lend support to the prosecution's charge that defendant intentionally killed Montoya. They describe a desire and willingness to kill and to do so in a manner similar to how defendant killed Montoya. His writing, "Put it in your face and melts in your mouth like an M&M," "two to the gut, watch you shut your eyes slow," and, "I shoot for fun just to watch niggas shake like they goin' dumb. Put two in your chest, now you goin' numb" eerily describes what he did to Montoya—shot him in the face and twice in the gut. A jury could infer from defendant's lyrics his identity as the shooter and his intent to shoot the victim in a specific manner.

Defendant contends *Olguin* and *Zepeda* do not apply here because he was not charged with a gang enhancement and there was no expert witness who explained how the lyrics could be a form of communication rather than an artistic expression. Defendant reads *Olguin* and *Zepeda* too narrowly. Those cases did not turn merely on whether they involved gang enhancements and gang culture. Rather, they turned on whether the lyrics were relevant to the charges against the defendants. That the lyrics were relevant in those cases does not preclude defendant's lyrics from being relevant to his murder charge where no gang enhancements are alleged. The admitted lyrics contain no references to gang affiliation or behavior, but that does not preclude them from indicating circumstantially he committed the murder. And both *Olguin* and *Zepeda* stated the lyrics were relevant not just to the gang enhancements, but also to the defendants' intent and identity in committing the underlying murders.

10

Defendant argues the lyrics were irrelevant because there was no evidence indicating when they were written or how long defendant had possessed them. Indeed, the lyrics were found some three years after the murder. As in *Olguin*, however, the lyrics, authenticated as written by defendant, inferentially identified his intent to kill in the manner in which he killed Montoya. His dispute with Montoya went back many years. Thus, whether the lyrics recorded his intent to kill in the future or the intent he harbored when he killed in the past is insignificant. In either case, he intended to kill.

Defendant claims the lyrics did not rise to the level of a confession and should not be treated as such. The trial court did not treat the lyrics as a confession. It admitted them as circumstantial evidence. A limiting instruction would have ensured the jury did not view the evidence for more than what it was, but defendant did not request one and the trial court was not required to provide one sua sponte. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051.) It did not abuse its discretion in finding the evidence relevant.

### 2. *Undue prejudice*

Second, we conclude the trial court did not abuse its discretion in determining the lyrics were not unduly prejudicial. Evidence Code section 352 grants the trial court discretion to exclude otherwise relevant evidence if its probative value is substantially outweighed by the probability that admitting the evidence will unduly prolong the proceeding, prejudice the opposing party, confuse the issues, or mislead the jury. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1014, disapproved on another ground in *People v Doolin* (2009) 45 Cal.4th 390, 421 fn. 22.) For purposes of Evidence Code section 352, " 'prejudicial' is not synonymous with 'damaging,' but refers instead to evidence that ' "uniquely tends to evoke an emotional bias against defendant" ' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

In *Zepeda*, we determined the admission of rap lyrics was not unduly prejudicial under Evidence Code section 352. The trial court's playing the two CD tracks to the jury was not prejudicial because four other tracks were not played, the tracks provided

11

noncumulative evidence of the defendant's state of mind and his gang association, and the substance of the lyrics, although graphic, did not evoke an emotional bias against the defendant as an individual apart from what the facts proved. (*Zepeda*, *supra*, 167 Cal.App.4th at p. 35.)

Applying the same analysis here, we conclude the lyrics were not unduly prejudicial. The trial court admitted only those lyrics it determined were similar to the crime that occurred, the evidence was circumstantial and not cumulative, presenting the evidence was not time consuming and would not have confused the jury, and the lyrics did not evoke an emotional bias against defendant unrelated to the facts of the crime. The lack of bias is particularly so since the lyrics did not indicate defendant was a gang member or describe violent acts unrelated to the type that occurred.

Defendant argues prejudice exists and asks us to follow an analytical approach toward rap lyrics taken by the New Jersey Supreme Court in *State v. Skinner* (2014) 218 N.J. 496 [95 A.3d 236] (*Skinner*). *Skinner* held that "[f]ictional forms of inflammatory self-expression, such as poems, musical compositions, and other like writings about bad acts, wrongful acts, or crimes, are not properly evidential unless the writing reveals a strong nexus between the specific details of the artistic composition and the circumstances of the underlying offense for which a person is charged, and the probative value of that evidence outweighs its apparent prejudicial impact." (*Skinner*, *supra*, 218 N.J. at p. 500.)

However, defendant concedes the analysis in *Skinner* is "similar to that required under Evidence Code section 352," which is the analysis the trial court performed here. Furthermore, the trial court implicitly found a nexus between defendant's crime and his lyrics. The lyrics reflected the specific actions defendant personally took when he killed Montoya. If *Skinner* was the law in California, the trial court's findings would have satisfied its demands.

12

### 3. *Harmless error*

Third, even if admitting the lyrics was error, we would conclude the error was harmless. Generally, we review the erroneous admission of evidence to determine if it is reasonably probable defendant would have received a more favorable verdict in the absence of the error. (*People v. Price* (1991) 1 Cal.4th 324, 429; *People v. Watson* (1956) 46 Cal.2d 818, 836.) However, defendant contends admitting the lyrics violated his constitutional rights to due process and a fair trial, and we must review for harmless error under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)

If viewed under the federal constitutional error standard, the error would be harmless beyond a reasonable doubt. Had the lyrics not been admitted, the jury still would have convicted defendant of murder, due to the testimony offered by Dabney and Starnes. Dabney, the only eyewitness to the crime, unequivocally identified defendant as the shooter. Starnes corroborated Dabney's identification with testimony that defendant told him he shot someone that night. Cell phone records placed Van and Dabney at the scene of the crime, and surveillance film recorded a white Acura driving across the Freemont Bridge shortly after the time of the crime. This evidence corroborated Dabney's testimony. Any error in admitting the lyrics was harmless.

## II

### *Reading of Testimony to Alternate Jurors*

After instructing the alternate jurors not to talk about the case with anyone and not to have any contact with the deliberating jurors, the trial court announced it was its practice to have the alternate jurors brought into the deliberation room to hear any read back of testimony requested by the jury. No party objected to the court's practice.

The attorneys also stipulated the reporter could read back testimony in the deliberation room outside their and their clients' presence so long as the reporter ensured there was no discussion during the reading.

On the day deliberations began, the jury requested a reading of Dabney's testimony. The minutes indicate the reporter read the testimony in the deliberation room the following day, and the alternate jurors were present for the reading.**3**

Defendant contends the alternate jurors' presence for the reading violated his constitutional right to a jury trial. He asserts the alternates' presence infringed on the jury's deliberative secrecy.

Defendant has forfeited this argument. " 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' (*Yakus v. United States* (1944) 321 U.S. 414, 444 [88 L.Ed. 834].)" (*United States v. Olano* (1993) 507 U.S. 725, 731 [123 L.Ed.2d 508, 517].) At no time did defendant oppose the court's practice of admitting alternate jurors into the deliberation room to hear testimony reread. As a result, he has forfeited this claim.

If defendant had not forfeited the argument, we would reject it on its merits. "[T]he presence of alternates in the jury room during deliberations is not necessarily detrimental to a defendant's right of trial by jury and . . . defense counsel may stipulate to such procedure." (*People v. Valles* (1979) 24 Cal.3d 121, 125.) [A] defendant may not complain on appeal of the presence of an alternate juror in the jury room during deliberations when his counsel stipulates to the procedure." (*Id.* at p. 127.)

If the alternate is present pursuant to the parties' stipulation, the alternate should be instructed not to participate in the jury's deliberations in any manner. If the alternate *disobeys* that instruction, "the standard rule concerning juror misconduct applies, namely, that it is presumed prejudicial to the defendant unless the contrary appears." (*People v. Valles, supra,* 24 Cal.3d at p. 128.)

---

**3** The reporter's transcript contains no record of anything transpiring on that date.

By contrast, if the alternate is present in the jury room without authority to be there, the "error is properly analyzed as a species of jury misconduct to which a presumption of prejudice applies and which does not merit reversal if the error is shown to have caused no prejudice." (*Brassfield v. Moreland School Dist.* (2006) 141 Cal.App.4th 67, 72.)

Here, the alternates were present in the jury room for the read back pursuant to what was in effect a stipulation by the parties, and there is no evidence any of the jurors spoke about the case while the alternates were present. The alternates were in the jury room pursuant to the court's practice and the parties' implicit agreement with that practice. They were instructed not to have any discussions with the jurors, and the parties stipulated to the reporter rereading the testimony in the jury room so long as the reporter ensured there was no discussion in the room while the reporter was present.

Defendant has not shown the alternates participated in any deliberations, their presence had any effect on the other jurors, or that their presence was prejudicial to his rights. Thus, there is no evidence of jury misconduct, and defendant cannot complain that the alternates heard the testimony reread in the jury room with the other jurors.

III

*Motion for New Trial*

After Van was acquitted of murder in the joint trial, defendant filed a motion for new trial on the basis of discovering new material evidence. The new evidence consisted of a declaration by Van stating Dabney killed Montoya. The trial court denied the motion. It found Van's testimony not to be credible and, in light of the other evidence introduced at trial, implicitly found the declaration would not render a different verdict reasonably probable in a retrial. We conclude the trial court did not abuse its discretion denying the motion.

A.      *Background information*

Van stated that on the day of the murder, he and Dabney arrived together in the car to the Pulido home.  Dabney delivered drugs inside the home and returned to the car with money.  Van asked Dabney who the people were hanging around outside the home.  Dabney named a few people, including "Little Joe."

Van told Dabney he and Little Joe were "funking it."  According to Van, "funking it" means to shoot on site.  Dabney responded, "Don't trip, I'm on it."  Dabney went to say hi to the group, called out Little Joe to the street, and shot him four times.  Dabney hopped back into the car, and they left the area.

At some point, they crossed the Freeport Bridge, and Dabney threw his cell phone into the river.  As they were driving, Dabney disassembled the gun and threw the parts away piece by piece.

They went to defendant's home.  Dabney burned the clothes he was wearing at the time of the shooting in defendant's barbecue.  Defendant did not know what was going on.  He said "he and his girl were going out of town," and Van and Dabney asked if they could go along.  That is how they ended up going together.

During the trip, Dabney stated he shot Montoya in retribution for Montoya knocking out Van's teeth.  Van stated Dabney "is like my little hommie.  He called me 'Big Bro' and I called him 'Little Bro.' "

Van stated he did not testify at trial on the advice of counsel.  He also stated he did not intend to appeal his conviction.  He made the declaration under penalty of perjury.

The trial court denied the motion for new trial.  It acknowledged the factors it was to review, and it ruled the new evidence was not credible and not material.  Initially, the court noted two inconsistencies in Van's declaration.  He stated he did not intend to appeal his conviction, but he had in fact appealed restitution.  Also, he stated he did not

testify on advice of counsel, but the court had personally questioned Van and he indicated it was his desire not to testify.

The court questioned Van's credibility based in part on his behavior since his arrest. At one point in the proceedings, Van brought drugs into the courtroom. He possessed contraband in county jail on "voluminous, numerous instances," ultimately subjecting him to a security hearing. He also was written up on "numerous occasions" for possessing narcotics, pruno, and other violations.

The court also questioned Van's credibility because he denied driving a white car with Lamborghini doors. Virtually everyone agreed he drove a white car with Lamborghini doors.

In comparison, the court found Dabney was credible. The jury was instructed Dabney's testimony had to be corroborated for the jury to consider it, and the jury agreed with him. The court viewed his demeanor and listened to him. He was subject to a thorough cross-examination that brought forth every inconsistency in Dabney's multiple statements on different occasions, including before the jury.

The court found Michael Pulido and his brother, Jose Pulido, were also credible witnesses. Both were reluctant to testify and did not want to cooperate with law enforcement for fear of reprisals. They wanted nothing to do with this case despite having a close relationship with the victim. They both testified Dabney was already present at their home when Van arrived in his Acura with Lamborghini doors, and that a second person was in the car with him.

The court also considered the testimony of defendant's neighbor, Robert Starnes, and Starnes's statements to police. Starnes testified defendant told him after the murder he had shot someone and had to leave town.

The court concluded: "So it is for all of those reasons that I do not find Mr. Van to be credible. In fact, I find his affidavit to be self-serving, incredible, and, for what it's worth, technically perjury since he signed this under penalty of perjury. [¶] The rules

17

simply do not apply to Mr. Van, and he has made that very, very clear during the course of these proceedings and while he was a resident of the taxpayers of Sacramento County while in our jail. [¶] So for all of those reasons I will deny the motion for a new trial."

B.    *Analysis*

Defendant contends the trial court abused its discretion because it did not consider the required factors for ruling on a motion for new trial. He argues the court focused on Van's behavior instead of determining whether Van's statement, if admitted at a new trial, could result in a different verdict. He claims the court's belief that Van lied was illogical under the circumstances and overly harsh. He asserts the court placed undue emphasis on Van's character to determine credibility, and it relied upon evidence defendant believed he had impeached. We find no abuse of discretion.

" ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citations.] ' "[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background." ' [Citation.]

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

"In addition, 'the trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable.' [Citation.]" (*People v. Delgado*, *supra*, 5 Cal.4th at p. 329.)

18

Here, no unmistakable abuse of discretion appears.  Many of the factors a court would consider on a motion for new trial based on new evidence were not disputed here. The evidence was newly discovered, it was not cumulative, defendant could not have obtained it earlier since Van did not testify, and it was the only direct evidence of the acts it presented.  The key issues, therefore, were whether the evidence was credible and material such as to render a different result probable on retrial.  On these points, the trial court explained its reasoning in detail.

Van lacked credibility because he misrepresented his intentions in court and he could not conform his behavior to rules of conduct.  Four key witnesses at trial contradicted his testimony, and the court found all of them more credible.  From this, the court concluded Van's testimony was not credible or material and thus would not likely have changed the result on retrial.  The court did not abuse its discretion in reaching this conclusion.

## DISPOSITION

The judgment is affirmed.

                                                              NICHOLSON          , J.


We concur:



        RAYE            , P. J.



        BUTZ            , J.

19