Filed 2/8/22  P. v. Ryan CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KYLE PATRICK RYAN,<br><br>    Defendant and Appellant. | G059591<br><br>(Super. Ct. No. 18WF1096)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge.  Affirmed.

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

*        *        *

Kyle Patrick Ryan appeals from the trial court's entry of judgment after a jury verdict finding him guilty of the forcible rape (Pen. Code,[1] § 261, subd. (a)(2); count 2) of Kendra C. in 2018. The evidence showed Ryan drove past Kendra following Cinco de Mayo festivities in Huntington Beach, saw that she was intoxicated, circled back, and guided her into his vehicle according to video surveillance footage.[2] The jury also convicted Ryan of forcible oral copulation (§ 288a, subd. (c)(2)(A); count 4), false imprisonment by menace, violence, fraud or deceit (§§ 236; 237, subd. (a); count 5), and of two lesser included offenses on other counts. Specifically, the jury found Ryan guilty of false imprisonment on count 1 as a lesser included offense of kidnapping to commit a sex offense and, on count 3, of simple battery (§ 242) as a lesser included offense of sodomy by force. The trial court sentenced Ryan to an aggregate prison term of 16 years and 8 months.

On appeal, Ryan contends the trial court erred in several of its evidentiary rulings, including by admitting statements he made to officers in a parking lot before they arrested him, in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). He also contends subsequent statements he made at the jail after he was arrested and received *Miranda* warnings could not be admitted; he argues they were elicited in a manner designed to intentionally evade *Miranda*, thereby constituting a due process violation under *Missouri v. Seibert* (2004) 542 U.S. 600 (plur. opn.) (*Seibert*). Ryan further asserts the court erred in admitting statements Kendra made to a responding police officer, and in admitting lyrics from his notebook which arguably mirrored the facts of the case.

---

[1] All further statutory references are to this code.

[2] We use only Kendra's first name for the privacy of her family. She was 50 years old at the time of the offense. According to a stipulation read to the jury at trial: "[O]n April 2nd, 2020 while this criminal case was pending[,] Kendra C. unexpectedly passed away unrelated to the circumstances of this case."

2

Ryan also argues the court did not consider his ability to pay certain fines and fees it imposed, and thereby violated due process. As we explain, none of these challenges has merit; we therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 5, 2018, Kendra and two friends, including Steven C., rode their bikes to a restaurant on the beach, where they each had "two or three" beers over the course of almost three hours. Steven testified they rode back to downtown Huntington Beach around 5:00 p.m. One friend departed; Kendra and Steven then went to a cantina where they had two margaritas before leaving around 7:30 p.m. They had not eaten any food until that point. Video footage of Kendra departing the cantina showed she stumbled slightly and reached for a railing for support. The cantina footage showed Kendra was fully clothed, wearing a blue shirt and white shorts, with her purse strapped across her chest. According to Steven, she was not disheveled, injured, or complaining of any pain when she left.

The video from the cantina played for the jury at trial suggested Kendra was intoxicated when she left the establishment. The footage did not show Ryan. A detective also retrieved footage from a nearby convenience store, which showed Kendra walking away from the cantina in the direction of her home at around 7:35 p.m. Kendra passed out of view of the camera by 7:37 p.m.; within a few minutes, at 7:41 p.m., Ryan's white Toyota passed by the convenience store in the same northbound direction that Kendra was walking.

The detective also retrieved security camera footage from a liquor store one block from the convenience store. The footage showed Ryan's vehicle drive past the liquor store, disappear from view, and then return—turning abruptly into the liquor store parking lot. The liquor store footage showed Ryan exit his vehicle at 7:42 p.m.; he briefly reentered the back seat. He then left the vehicle and walked southbound along the

3

street, passing out of view of the camera. At 7:47 p.m., when Ryan reentered the camera frame, his right arm was around Kendra and his right hand was on her right hip. She appeared unsteady on her feet.

As they walked behind Ryan's vehicle, Kendra moved away from the car in the direction of her home. Ryan then opened his front passenger door, guided Kendra into the front seat, closed the door, and while holding what appeared to be Kendra's black purse, walked around the vehicle and got into the driver's seat. Ryan then drove away eastbound from the liquor store at 7:48 p.m. with Kendra in his car.

Around midnight, Melanie and Jarrod Z., who lived about a mile from downtown Huntington Beach, found Kendra, whom they did not know, naked at their front door, waving frantically at them through a window. She was clutching a bikini top but did not have any other clothing or belongings with her. She seemed to have difficulty forming sentences. She begged for their aid, stating, "There was a man in a car, and he's attacked me, I need help, I need help." Jarrod saw "significant" bruising on Kendra's back. He told a visiting friend to call 911 while Melanie gave Kendra a towel and some clothing and tried to comfort her. Responding officers arrived within minutes.

Kendra spoke first to Officer Eric Hardman, who found her to be "in shock, very distraught, in fear for her life, crying, disheveled, [and] very emotional." Her face was red, she had a scratch below one of her eyes, and he observed bruising and scratches on her back. She told the officer she had been trying to walk home after drinking and riding bikes earlier with friends, but somehow ended up with a man in what she believed was a white van. The man struck her in the face with his closed fist when she refused to perform oral sex on him. He then held her down with his forearm and raped her vaginally while she pleaded, "No." He kept repeating "over and over" the phrase, "'You dirty fucking slut, you like that,'" as he forced himself on her. Kendra did not remember how she escaped the vehicle.

4

At the officer's suggestion, Kendra then spoke to a female officer, Evelyn Alvarado, who arrived a few minutes later. Officer Alvarado observed that Kendra was still "emotional, distraught, and in shock," and she displayed "symptoms of intoxication," but the information she gave remained essentially the same. The only detail Kendra added was that in the course of being repeatedly "raped" and after trying to fight off her attacker, she gave up for a time before she somehow escaped.

A hospital exam later that night revealed Kendra suffered blunt force trauma to her face, arm, back, and hip, including multiple areas of bruising. A nurse experienced in sexual assault examinations opined that a large, linear bruise on Kendra's back could have been caused by a gear shift lever or column shown in a picture of Ryan's vehicle. Four bruises spaced apart on Kendra's breast appeared to be grab marks; scratches on her forearm were consistent with defensive injuries. Multiple injuries were consistent with forcible penetration, including labial fold lacerations, an abrasion at the vaginal opening, five to eight lacerations around the anus, and active bleeding in the rectal canal. A tampon removed from Kendra's vagina was also consistent with sexual assault. DNA swabs were taken during the exam.

On May 10, 2018, detectives located Ryan's vehicle in a parking lot near UC Irvine. They followed Ryan in an unmarked car for "about an hour" to an elementary school parking lot in Santa Ana where he stopped and parked. Detectives made contact with Ryan in the parking lot. After conversing with him there, as we discuss more fully below, the officers arrested Ryan.

DNA samples taken during Kendra's exam from her neck, left breast, vulva, vagina, external anal area, and around her mouth matched Ryan's DNA profile. Ryan's vehicle was impounded and investigators found Kendra's sandals in the trunk of the car. They also found the hat and long sleeve shirt Ryan was wearing in the liquor store surveillance video. Reddish-brown stains on the shirt matched Kendra's DNA

5

profile. Semen recovered from swabbed areas of the passenger door of Ryan's vehicle matched his DNA profile.

The investigators also found a notebook in the trunk containing these handwritten song lyrics: "'I'm on it like every single weekend looking for sexy bitches that's tweak'in,'" "'Going for a walk down the block,'" "'Let's get high and you can suck my [illegible text],'" "'Don't forget to buckle up,'" and "'I never stick it in her butt, that's gay shit. I only fuck pussy, mouth, and tits, okay bitch.'" Ryan was 34 years old when he was arrested.

The jury convicted Ryan as noted above, and he now appeals.

## DISCUSSION

I. *Miranda*

Ryan contends the trial court erred by failing to suppress the statements he made to the two plainclothes police officers who approached him sometime after 10:00 p.m. in the school parking lot along Harbor Boulevard. The officers contacted Ryan after he stopped in the drop-off area of the parking lot.

A. *Background*

Detective Anthony Pham testified at the pretrial hearing under Evidence Code section 402 that once he and his partner located and followed Ryan in his vehicle, they did not activate the lights or sirens in their unmarked car, did not use the car loudspeaker to address Ryan or direct him to pull over, and did not initiate a traffic stop. Instead, they parked about 10 feet behind Ryan's car—without blocking him in—after he stopped in the parking lot. They approached Ryan's car on foot, with Pham's partner identifying the pair, according to a recording of the encounter, as police officers but "not . . . [¶] . . . [¶] like normal cops." According to Pham, before he retrieved his recording device from his vehicle and turned it on, he also had "identified myself and my partner as

6

police officers." He also asked Ryan "to step out of the vehicle, which he willingly did so."

Pham then asked, "What's going on?" Ryan responded that he was "[j]ust trying to find a place to smoke weed" and that he "kn[e]w what goes on right here," namely that the area was "known for prostitution." Pham accepted Ryan's statement that he was "not trying to get any hookers." He assured Ryan that was not their concern ("Nobody's here to judge") and told Ryan that "we're definitely not worried about, you know, any, any bit of marijuana." Pham added, "[W]e're trying to, we're trying [to] get things figured out, we're just get[ting] things sorted out. You're not under arrest. You understand that, right?" Ryan answered, "Okay."

Pham turned the conversation to "last Saturday night," asking, "Hey, um, Kyle where were you at, um, last Saturday night?" Ryan answered, "Last Saturday? Huntington Beach." When Pham asked if there was an "occasion" for Ryan to be there, Ryan claimed he was working there that night, but then made no further mention of work. Instead, as Pham and Ryan continued to talk about Ryan's day in what the trial court characterized as "a casual conversation" in which both parties were "calm," and Ryan "was consenting to this verbal exchange," Ryan stated he arrived down at "the pier" by himself about 10:00 a.m., stayed "[a]bout two hours," then left to retrieve his camera at a friend's house in Costa Mesa before returning to the pier area for "pretty much . . . the whole day."

Ryan acknowledged this was "only a few days ago" and then added detail to his account. On his return from Costa Mesa "like around 2:00 or so," he stopped at a liquor store where he bought a "tall can" of beer that he consumed at the beach. Ryan said he hung out on Main Street, where he "talk[ed] to . . . people with dogs" since he trained dogs, and he "talked with the street, street artists [and] I think two girls," at which time Pham asked, "um, did you get any phone numbers from girls, dog trainers, or anybody like that?" Ryan said no.

7

Pham further inquired "did you do anything else with anybody down there before you went home?" Ryan answered, "So I met a girl when I was down there." He said they did not meet "in a bar" or "in a restaurant," but rather "just walking along Main Street." Pham then asked, "What happened?" Ryan responded that he "met a girl, we went back to my car, we were making out, and we both, um . . . got a little drunk." According to Ryan, after moving the car "like down around the corner where it wasn't so populated," an idea that was "[b]oth of ours," he claimed they "drank a little bit more, and started making out more"; he then "took her shirt off," and they continued "making out," at which point Pham interjected, "which is fine."

Ryan then proceeded into a narrative: "And everything was consensual, and we both got a little wasted, and then we both [fell] asleep in the front seats." He didn't know if "I woke up first or she woke up first, but she said she had to pee, and her shirt, her shirt was off at this point, and so I got out of the car and helped her out of the car, and she was holding onto my arm while she was peeing outside . . . , and then she asked me where we were, and she had this like blank look on her face, and it was nighttime at this point , and she said, where are we?" When Ryan said he was "not really sure" of their location, "she walked, um, after she took her, her shorts off to pee she just walked out to the middle of the street without any clothes on to see what street we were at." Ryan said he reacted by stating, "[U]h, what're you, you know, what're doing? You're naked get back in the car."

Pham stated "Yeah" when Ryan paused; Ryan then continued his narrative: "she walked back to the car and she just grabbed, grabbed her stuff, and she's just like looking around saying, where, uh, where am I? And at this point she started walking up to one of the houses, and, uh, I just kind of, uh, we had both literally just woken up, and I got freaked out 'cause she was like where am I? And she didn't, she like looked at me and she's super, super waste[d]. I couldn't talk to her about . . . [¶] . . . [¶] about anything."

8

Pham said, "Right," and then he asked, "how long do you think that was" from "the time you guys parked up until that all went down . . . ?" Ryan estimated, "Probably like from . . . 6:00 to 7:00ish to like 11:00ish," which Pham summarized as "four plus five hours?" and Ryan added, "Probably asleep for like, uh . . . most of the time."

Pham responded, "Most of the time? Did you guys have sex?" Ryan denied it. From this point forward, which is just under the halfway mark of the transcript of the 50-minute conversation, Pham asked largely open-ended questions such as, "So what happened then?" Pham prefaced the questions with statements like, "we get it. It's Saturday, Cinco de Mayo, [you] go downtown, try to meet a girl, which is probably 90 percent of all guys, single guys." "Nobody's here to judge." "[W]ere you trying to hook up? It's okay. It's, it's very normal."

Ryan described the sexual activities he claimed he and Kendra engaged in for "like five minutes," which did not involve intercourse because he "never ha[s] sex without a condom." Then, while "it was still light outside," "we both fell asleep" for, in Ryan's estimate, "about three hours." Ryan relayed that when they woke up after Kendra peed, she "starts walking up to the house that's right there, naked." He said, "I freaked out. I didn't know what to do. [¶] . . . [¶] And I, I fucking I left." Ryan didn't remember which way he departed but clarified he "felt fine to drive at that point."

Pham then told Ryan, "We're not trying to get in your face. We're talking very calmly, you're, we're treating you with respect. We're just trying to, you know, understand what, what, what happened?" Pham's partner, as the trial judge later observed, "asked very few questions"; the partner did not stand nearby the whole time, instead "moving about doing other things." Ryan then acknowledged "it was a crazy situation" in which "Things went from like zero to 60 just like, like we had literally just woken up." Ryan went on to describe that, as he drove away, realizing "her shorts were like in my front seat," he "just like threw them out the window." When asked if he made

9

"any stops on the way home," Ryan responded he "realized that her purse was in the back seat" while he was still "in the neighborhood," and "then I, I freaked out and I like threw it out" the window. He also "tossed" her phone "out the window . . . into a little grass spot."

Pham asked, "Um, so you definitely didn't have sex with her right?" Ryan affirmed he did not. Pham then told Ryan "we're pretty fair guys" and that "we know a little bit more about the situation . . . than you might think," asking Ryan "if you ever had any type of sex with her," to which Ryan answered only "oral sex," denying vaginal or anal sex.

During the remainder of the interview Pham disclosed that Kendra claimed "some[]things happened with you that were a little bit more than you already told me," that "she knocked on that door, she called the police, . . . she said that she, she had been raped." Pham asked Ryan to "take a step out of your shoes if you don't mind," "pretend you're us," and "what do you think we should, we should think happened?" Ryan insisted "[e]verything that happened was like 100 percent consensual," that his "options" were limited when Kendra suddenly departed naked after having "woken up from like a drunk sleep," which he "could imagine . . . could be a really scary situation for her." But he also had "woken up from like a drunk sleep" in the past, "not know[ing] where I was at," and her actions "scared the shit out of me," causing him to leave "in the, the moment."

When Pham said Kendra's medical exam disclosed "some significant injuries to her," Ryan asked, "What kind of injuries?" He then claimed, "she said she had fallen" "right before we had met on Main Street." When Pham said the injuries included "damage to her, to her anus," Ryan stated, "I did not touch her, her butt in any way, shape, or form." Ryan denied nonconsensual sexual activity with Kendra, including placing his penis in her mouth when she was unconscious.

10

He claimed he received express consent for the nonpenetrative sexual acts they engaged in, including holding her wrist during those acts ("I was asking her if it felt good"), which was the only bruising Ryan could envision. Ryan also claimed, in response to Pham's question, "how did she actually get into your car," that "she opened the door for herself because I can't open it from the outside because [¶] . . . [¶] the key doesn't even work."

Pham never accused Ryan of lying. Pham suggested there were perhaps other explanations for Kendra's injuries ("Is there something that she, . . . that would be possible"). This included that Ryan or Kendra may have been intoxicated and were misremembering, which Ryan denied for his part, stating he "remember[ed] everything that happened that night" except "exactly what streets I took when I left."

Pham agreed as the interview wound down that Kendra may have been mistaken, recapping "let's kinda put everything together": "You met her, she was drunk and she had fallen, or told you she fell?" When Pham asked if that were the case, and Ryan answered, "Yeah," Pham responded, "That's cool," and affirmed, "Okay," when Ryan further stated that, in his experience, women often fell in heels.[3] After the interview, Pham conducted a pat-down search of Ryan and placed him under arrest. Ryan was handcuffed at that point, received *Miranda* warnings, and was transported to his residence for a "consent and probation search."

B.    *Ryan's Testimony*

Ryan testified at the pretrial hearing about how his encounter with Pham began. He acknowledged he was not pulled over at the school and that he "chose that location on [his] own." According to Ryan, Pham and his partner both approached the

---

[3]    Pham clarified in his pretrial testimony that when he used the phrase, "That's cool," in speaking with Ryan during the interview, he "didn't really mean that's cool" . . . "legally speaking."

11

driver's side window of his car without identifying themselves as officers, but "started to ask me a bunch of questions [about] what am I doing in the area." Ryan "put 2 and 2 together and made the assumption that these are probably undercover police officers." According to Ryan, he could also see "at least three" similarly-dressed individuals, whom he assumed were also officers, "outside of one of the other vehicles" that had pulled into the lot, but which remained "about 30 or so feet away." When Ryan "asked them why did they even approach me in the first place, . . . they said I was a suspicious vehicle in an area known for criminal activities and prostitution."

Ryan testified he exited his vehicle at the officers' request after "they told me that . . . if I was clear of warrants and no drugs or no weapons, that they would let me go on my way." According to Ryan, he refused the officers' repeated requests to search his vehicle because this wasn't "the first time I had a police officer pull me over and want to search my car, and I didn't have anything to hide." Ryan was just "hoping that they would run my stuff . . . and they would let me be on my way for the night." He testified that before he exited his car, the officers in requesting to search his vehicle, told him "'we can do this the easy way or the hard way.'" Ryan indicated the officers had him place his hands on the steering wheel after he became "animated"; they then asked him to turn off his ignition, which he did. Once Ryan exited his car, one of the officers patted him down "to make sure I didn't have any drugs or weapons." In Pham's recording, Ryan's music from his vehicle continued to play during the interview.[4]

C.    *The Trial Court's Ruling*

After "[l]ooking at the totality of everything, including the recording[], the transcripts, the testimony, and the way this unraveled," the trial court concluded, "I just

---

[4]    Pham contradicted Ryan's account of the contact, testifying at the pretrial hearing that he "didn't tell him to put his hands on the steering wheel," "didn't tell him, 'We can do this the easy way or the hard way,'" "didn't order him out of the car," or "give him any orders," including "where to stand" outside the vehicle.

12

don't see how this fact pattern would trigger the requirements that *Miranda* would have had to be given." The court found based on "the language going back and forth, it appeared to be a casual conversation" in which both Ryan and Pham were "calm." There was "certainly nothing in the recording that suggests that the officer's tone was accusatory or harsh." "Further," the court continued, "there is just a truck load of other evidence which really supports or corroborates this court's opinion that *Miranda* would [not] be required."

The court summarized some of that evidence, including that "no one told [Ryan] to pull over," there was "no traffic stop," "no directives from any type of public address or intercom system." Once the officers "pulled up," they parked "around 10 feet away," as Ryan confirmed at the hearing, "never block[ing]" Ryan. The officers "don't draw their weapons," "never handcuffed" Ryan or "searched his car" until after the interview, "never ordered [him] to get out of the car either verbally or by the use of any display of weapons," and Ryan "was told he wasn't under arrest."

The court found Ryan "never said he didn't want to speak to them," but rather gave the appearance he "was consenting to this verbal exchange"; in fact, "he even wanted some water and they got him water." The court further observed neither Pham nor his partner "got into [Ryan's] face" or used "any type of ruse to elicit any type of confession or admission"; nor was there any "yelling" or "accusing." Instead, "multiple times" Pham "said, look, I just want to get your side of the story." The court concluded Ryan "was not in custody" and therefore a *Miranda* advisement "would not be required." The court also expressly found no "purposeful violation of *Miranda*," nor actions conducted by the officers as "a way to get around *Miranda*."

D.    *Governing Law*

*Miranda* requires officers to advise suspects in police custody of certain rights, including the right to remain silent, to safeguard the Fifth Amendment's guaranty

13

against self-incrimination. (*Miranda*, *supra*, 384 U.S. at pp. 473-474.) These warnings are designed to "compensate for the coercive pressures inherent in a custodial interview." (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1405 (*Pilster*).)

The warnings, however, are required when an individual is interrogated while in police custody, which the Supreme Court has explained arises "as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" (*Berkemer v. McCarty* (1984) 468 U.S. 420, 440 (*Berkemer*).) "'Absent "custodial interrogation," *Miranda* simply does not come into play.'" (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.)

"Custody determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest?" (*Pilster*, *supra*, 138 Cal.App.4th at p. 1403, fn. omitted.) Hallmarks of a custodial arrest include "handcuffing, drawing a gun, holding by the arm, or placing into a police car." (2 LaFave et al., Criminal Procedure (4th ed. 2015) Interrogation and Confessions, § 6.6(f), at pp. 833-834, fns. omitted.) Consequently, physical restrictions often implicate *Miranda* because they convey to the suspect that he or she is "'completely at the mercy of the police'" and, as in an arrest, his or her "detention is not likely to be 'temporary and brief.'" (*Pilster*, at p. 1404.)

The manner in which the suspect is detained and questioned is important, including the location, the ratio of officers to suspects, and the officers' demeanor. (*Pilster*, *supra*, 138 Cal.App.4th at p. 1403.) Informing the person he or she is not under arrest may be a factor. (*Ibid.*) Other factors include "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151 1162.) Additional considerations may include "whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and

14

controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*Ibid.*)

Whether an individual is in custody is a mixed question of law and fact. (*Pilster*, *supra*, 138 Cal.App.4th at p. 1403.) We defer to the trial court's factual findings if supported by substantial evidence, but independently evaluate whether the defendant was in custody. (*Ibid.*)

E. *Contentions and Analysis*

Ryan contends he suffered a *Miranda* violation because "any reasonable person in [his] position would not have felt free to end the questioning and leave." He cites such factors as the police "initiat[ing] the contact," he was "alone with two officers," he was asked "to step out of the car," the officers "made it clear they were investigating criminal behavior," their questioning indicated he was the "only suspect," they had evidence he was "culpable of a crime," the length of the contact, and Ryan's belief he had to comply "with the detectives' requests," including because "they were police officers."

Not every police-initiated contact requires *Miranda* warnings, even when officers engage with someone suspected of a crime. (*In re Kenneth S.* (2005) 133 Cal.App.4th 54, 65.) "The mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings." (*Minnesota v. Murphy* (1984) 465 U.S. 420, 431.)

As a panel of this court observed, the issue "'is *not* whether a reasonable person would believe he was not free to leave, but rather whether such a person would believe he was in police custody of the degree associated with formal arrest.'" (*Pilster*,

15

*supra*, 138 Cal.App.4th at p. 1403, fn. 1.) As noted in *Berkemer*, few motorists would feel at liberty "to leave the scene of a traffic stop without being told they might do so," but that does not make such a stop comparable to formal arrest. (*Berkemer*, *supra*, 468 U.S. at p. 436, fn. omitted.) Restriction on a person's "freedom of action" is not enough (*id.* at p. 436); there must be a custodial environment that "presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." (*Howes v. Fields* (2012) 565 U.S. 499, 509.)

Here, substantial evidence supports the trial court's conclusion the contact began as something less than a traffic stop, where Pham did not pull Ryan over and their conversation appeared consensual. The record also supports an inference that the trial court did not believe Ryan's claims of aggressive police conduct such as threatening him with statements like, "We can do this the easy way or the hard way," requiring him to keep his hands on the steering wheel, requiring him to turn off his car, or ordering him out of the vehicle, but instead credited Pham's denial that these events occurred. We must defer to these implied factual findings. (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

In any event, none of these claims detract from the fact that—even assuming the truth of his claims and that he refused consent to search his vehicle—Ryan testified *he* believed as he agreed to talk to the officers that if he were "clear of warrants and [had] no drugs or no weapons, . . . they would let me go on my way." The belief was reasonable and, as such, it supports the conclusion Ryan's circumstances were not tantamount to arrest at that point.

This is true though there were multiple officers at the scene. Pham and his partner did not block Ryan's car; the other officers' presence in plainclothes was consistent with a vice operation that did not implicate Ryan once Pham assured him of that fact and dropped the topic. The fact that the interview lasted roughly 50 minutes appears to have arisen from Ryan and Pham's organic conversation and the detail Ryan

16

went into in his answers—not from questioning that became coercive or which created a police-dominated atmosphere.  No rigid time limit controls after which *Miranda* warnings must be given.  (*United States v. Sharpe* (1985) 470 U.S. 675, 685-686.)

Ryan's reliance on *People v. Saldana* (2018) 19 Cal.App.5th 432 (*Saldana*) for the proposition that the contact gradually ripened into a custodial detention is misplaced.  *Saldana* involved a classic, overbearing station house interrogation in which it is apparent "that questioning will continue until [the suspect] provides his interrogators the answers they seek." (*Berkemer*, *supra*, 468 U.S. at p. 438.)  Here, in contrast, Ryan chose the time and location of the open-air contact; there were no earmarks of a custodial arrest such as weapons drawn, handcuffing or other physical restraint, or placement in a squad car and transport to the station.  (*Pilster*, *supra*, 138 Cal.App.4th at p. 1404.)

The detective in *Saldana* did more than simply confront the defendant with adverse evidence.  He badgered the suspect with unqualified assertions of his guilt, despite Saldana's repeated denials. (*Saldana*, *supra*, 19 Cal.App.5th at p. 459.)  In finding the unwarned interrogation was custodial in violation of *Miranda*, the reviewing court found the detective's "insistence that Saldana was guilty, his disbelief of Saldana's many denials, and his use of classic interrogation techniques reflects the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." (*Id.* at p. 460.)

Pham's contact with Ryan was unlike the police grilling of the suspect which occurred in *Saldana*.  Pham testified at the pretrial hearing that it had "been years" since he had any "training on interrogation techniques," stating "[o]bviously I'm not an intimidating figure," but "I just generally like to talk to people."  The use of police ruses or stratagems in speaking to a suspect, including lying to the suspect about the strength of the evidence against him or her, does not necessarily violate *Miranda*.  (See e.g., *People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280; *United States v. Martinez* (9th Cir. 2015) 602 Fed.Appx. 658, 659.)  Their absence here supports the conclusion Ryan was not

17

subjected to a custodial interrogation. Considering the record as a whole, we find no *Miranda* violation.

II.    *Siebert*

Ryan contends the fact he was subjected to police questioning in the parking lot without *Miranda* warnings and later asked many of the same questions at the police station, but with the benefit of warnings, constituted a deliberate police tactic to circumvent *Miranda* that the United States Supreme Court condemned in *Siebert*. As we explain, *Siebert* does not apply here.

In *Seibert*, an officer "testified that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" (*Seibert*, *supra*, 542 U.S. at pp. 605-606 (plur. opn.).) Employing this tactic on the defendant, the officer "questioned her without *Miranda* warnings for 30 to 40 minutes, squeezing her arm and repeating" a suggestive, accusatory remark (*id.* at pp. 604-605 (plur. opn.)). The defendant admitted the truth of the accusation and, following a 20-minute coffee and cigarette break, the officer then read her the *Miranda* warnings, obtained her written waiver, resumed the questioning, "and confronted her with her prewarning statements" to again elicit inculpatory statements. (*Seibert*, at p. 605 (plur. opn.).)

A divided Supreme Court held the defendant's postwarning statements were inadmissible. (*Seibert*, *supra*, 542 U.S. at pp. 617 (plur. opn.), 622 (conc. opn. of Kennedy, J.).) The plurality proposed an objective test focused "on facts apart from [the officer's subjective] intent that show the question-first tactic at work." (*Seibert, supra,* 542 U.S. at p. 616, fn. 6 (plur. opn.).) This analysis asks whether, under the case-specific circumstances, "it would be reasonable to find . . . the warnings could function 'effectively' as *Miranda* requires" (*id.* at pp. 611-612 (plur. opn.)), recognizing that

18

midstream *Miranda* warnings "could lead to an entirely reasonable inference that what [the accused] has just said will be used, with subsequent silence being of no avail." (*Id.* at p. 613 (plur. opn.).)

Justice Kennedy concurred in the judgment but did not agree with the plurality's test that "envisions an objective inquiry from the perspective of the suspect . . . and applies in the case of both intentional and unintentional two-stage interrogations." (*Seibert*, supra, 542 U.S. at p. 621 (conc. opn. of Kennedy, J.).) Justice Kennedy instead adopted "a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." (*Id.* at p. 622 (conc. opn. of Kennedy, J.).) Despite hazards in determining whether an officer acted with wrongful intent, as noted by the plurality (*id.* at p. 616, fn. 6 (plur. opn.)) and the dissent (*id.* at p. 626 (dis. opn. of O'Connor, J.)), Justice Kennedy concluded no constitutional violation occurs unless the interrogating officer deliberately withheld *Miranda* warnings (*id.* at pp. 620-622 (conc. opn. of Kennedy, J.); contra *People v. Storm* (2002) 28 Cal.4th 1007, 1039-1040 & 1040-1049 (dis. opns. of George, C.J., and Chin, J.) [a custodial detainee who has let the "cat out of the bag" in an unwarned statement may conclude there is little choice but to continue to speak to officers after receiving a belated warning]; but see *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455).

*Siebert* does not apply here for two reasons. First, questioning Ryan in the parking lot without *Miranda* warnings did not constitute a *Miranda* violation because we have found it was not custodial. Therefore, "there cannot, by definition, be a second *Miranda* violation that would implicate the two-step interrogation process in *Seibert*." (*State v. Maciel* (Ariz. Ct. App. 2015) 358 P.3d 621, 627, superseded on other grounds in *State v. Maciel* (Ariz. 2016) 375 P.3d 938, 940-941.)

Ryan argues as the basis for his *Siebert* claim that "the lack of *Miranda* warnings for the first interrogation was deliberate *and unjustified*." (Italics added.) Ryan

19

relies on his own assessment after he received *Miranda* warnings at the police station, that he thought he was under arrest, or would be arrested, when in the first interview "you [i.e., Pham] started asking me where I was on Saturday." Ryan asserts that his subjective contention as to when he was arrested, combined with "Pham's knowledge of the *Miranda* requirements," retroactively "would have rendered the first interrogation invalid."

We disagree. *Miranda*'s application does not turn on the officer's knowledge or the suspect's subjective views, but rather on "'whether a reasonable person would have understood that his situation was comparable to a formal arrest.'" (*Pilster*, *supra*, 138 Cal.App.4th at p. 1406.) *Siebert* guards against police attempts to sanitize unwarned *Miranda* violations by eliciting the same information after the warnings are given. That concern is absent when, as here, there was no custodial interrogation in which *Miranda* warnings should have been given in the first place.

Second, *Siebert* cannot apply in light of the trial court's express factual findings. The court found there was no "purposeful violation of *Miranda*" and that Pham, in eliciting from Ryan "[his] side of the story," had not acted in "a way to get around *Miranda*." A trial court's conclusion that an officer or officers "did not deliberately use a two-step process to circumvent *Miranda*" "is a factual finding subject to the substantial evidence standard of review." (*People v. Camino* (2010) 188 Cal.App.4th 1359, 1364 (*Camino*).) This "deferen[tial]" standard applies "[g]iven Justice Kennedy's focus in *Seibert* on the subjective intent of the interrogating officer(s)." (*Id.* at p. 1372 & fn. 6.) This necessarily heightens "'the role of trial courts . . . to ensure that the accused's *Miranda* rights are protected.'" (*Ibid.*)

Ryan attempts to reargue the evidence below, insisting Pham must have harbored the intent prohibited in *Siebert* because of his "knowledge of the *Miranda* requirements" and because he acceded to defense counsel's line of questioning on cross-examination. For example, when defense counsel asked, "Now, of course it's

20

better to get two statements from a suspect than it is to get one, right," Pham answered, "Generally, yes." And when counsel continued, "[S]o if you can get a statement from the suspect before you read him *Miranda* and after, that is the best situation for you," and Pham responded, "Generally speaking, yes."

But this suggestive line of questioning did not require the trial court to conclude Pham employed a calculated two-step process, as discussed in *Siebert* to undermine *Miranda*. Credibility and intent are factual matters committed to the trial court's purview. (*Camino, supra*, 188 Cal.App.4th at p. 1371.) That the circumstances could be reconciled with a contrary finding does not warrant reversal. (*People v. Bean* (1988) 46 Cal.3d 919, 933.) This is particularly true where no custodial interrogation occurred and, therefore, there is no reason to think Pham intended to violate *Miranda*. Ryan's *Siebert* claim has no merit.

III.    *Crawford*

Ryan contends the trial court admitted the statements Kendra made to Officer Alvarado erroneously, in violation of his right "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the Supreme Court held the confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless [s]he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id*. at pp. 53-54.)

In *Davis v. Washington* (2006) 547 U.S. 813, 821 (*Davis*), the court clarified that only "testimonial statements" implicate a defendant's confrontation right. Statements made to law enforcement officials "are not testimonial if given and taken for nonevidentiary purposes such as the need to cope with ongoing emergencies." (*People v. Cage* (2007) 40 Cal.4th 965, 987.) In contrast, statements "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the

21

primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis*, at p. 822.)

During a pretrial hearing, the trial court rejected Ryan's hearsay objection to Kendra's statement to Alvarado, finding it qualified as a spontaneous utterance while still "under the stress of excitement caused by" an event. (Evid. Code, § 1240, subd. (b).) The court conditioned its ruling on the prosecutor laying foundation at trial regarding Kendra's demeanor in speaking to Alvarado "about 5 to 10 minutes after she is banging on the door" following her escape from her attacker's vehicle. Ryan does not challenge that ruling on appeal.

As to confrontation, the prosecutor similarly argued the scene presented "a contemporaneous immediate emergency for th[e] officers to obtain statements quickly about who this might be, what type of car it was [and] to then try to find that person to prevent any further harm from happening or other crimes from being committed." The trial court alluded to "a slew of cases that deal with this," and, "viewing this as non-testimonial," found "it's not a violation of *Crawford*."

On appeal, Ryan invokes or distinguishes many of the same cases cited by the court and others, including *Davis*. He cites *Davis* for the proposition that "'[i]nitial inquiries' may 'often . . . produce non-testimonial statements.'" (*Davis*, *supra*, 547 U.S. at p. 832.) Observing here that Hardman questioned Kendra before Alvarado did, Ryan notes the *Davis* court found in that case that the alleged domestic violence victim's "second interview produced testimonial statements." *Davis* concluded, "When the officer questioned Amy for the second time, and elicited the challenged statements, he was not seeking to determine . . . 'what is happening,' but rather 'what happened.'" (*Id.* at p. 830.)

Here, both Hardman and Alvarado testified. Alvarado testified first, Hardman then testified Kendra was "very distraught, in fear for her life" as she spoke, that he transported her to her medical exam, that he received an evidence collection kit

22

following the exam, and that he drove Kendra to her residence late that evening. His initial testimony did not involve any statements from Kendra.

On cross-examination, defense counsel elicited that in Hardman's initial contact with Kendra, which was "the first interview done by police," Kendra gave a physical description of her attacker that was apparently inconsistent with Ryan's description. She told Hardman "he had blond[e] hair," "was very tan," and "had no facial hair." She also "said this all happened inside of a white van." Ryan's Toyota vehicle was not a white van. Finally, on redirect, Hardman testified about what Kendra told him regarding the nature and manner of the attack. Ryan opened the door to admit Hardman's redirect testimony, and he does not challenge that conclusion on appeal.

Ryan's confrontation challenge to Alvarado's testimony is unavailing because the jury received—uncontested—essentially the same evidence when Hardman testified. Ryan does not suggest the statements Kendra gave to Hardman and Alvarado were different in any material respect. Nor does he claim he received ineffective assistance of counsel from his trial attorney, who we must presume made tactical decisions on his behalf. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) It is apparent to us trial counsel concluded that eliciting inaccuracies in Kendra's account, thereby impeaching her credibility, was worth sacrificing a *Crawford* claim in light of the trial court's firm conclusion regarding the emergency circumstances.

As the Supreme Court has held, "The right to confrontation may, of course, be waived, including by failure to object to the offending evidence." (*Melendez–Diaz v. Massachusetts* (2009) 557 U.S. 305, 313, fn. 3.) Evidence Code section 353 prohibits reversal for the allegedly erroneous admission of evidence absent an objection. Because there was thus no error in admitting Hardman's unopposed testimony, there can be no prejudice in the admission of the same testimony by Alvarado.

23

Anticipating this result, Ryan argues "[i]t is fundamentally unfair and a violation of due process to consider evidence that would not have come in but for erroneous evidentiary rulings," citing *People v. Albarran* (2007) 149 Cal.App.4th 214, 232. We observe again, however, that Hardman's testimony came in as a result of Ryan opening the door to it, not as a result of any evidentiary ruling by the court. Additionally, *Albarran* is inapposite. There the court found the improper admission of gang evidence was prejudicial under the federal due process standard (*Chapman v. State of California* (1967) 386 U.S. 18), and therefore no discussion of the state law standard for evidentiary error was necessary. *Albarran* did not involve forfeiture of an appellate claim for lack of objection below, and therefore is of no aid to Ryan.

IV.    *Lyrics*

Ryan contends the trial court erred by admitting a stanza of lyrics from his journal in a notebook recovered from his car.[5] The lyrics predated the charged offense by 11 months. Instead, the court admitted them as "circumstantial evidence of his intent" because they "closely mirror[ed] the facts of the case."[6]

---

[5]    The exhibit containing the lyrics is not included in the record on appeal but, consistent with Pham's reading of them into the trial record, Ryan represents that the first four lines, which the court found particularly probative, are: "I'm on it like every single weekend, looking for sexy bitches that's tweak'in." "Going for a walk down the block." The lyrics also reference a female subject getting into a vehicle ("don't forget to buckle up"), resulting in a sexual encounter described as: "I never stick it in her butt, that's gay shit. I only fuck pussy, mouth, and tits, okay bitch." Ryan does not suggest the court erred in concluding he wrote or copied the lyrics into his journal ("[T]hey are written. They are important to him. He's kept them. He's retained them.").

[6]    In ruling on the admissibility of the proffered lyrics, the trial court commented "it's not significant whether these lyrics were written before he was arrested [or] after he was arrested." We caution trial courts about making such unequivocal statements as they perform the balancing test (probative value versus prejudicial impact) required by Evidence Code section 352. The age and context of proffered statements will often be "significant" when determining their probity.

24

Relying on *People v. Coneal* (2019) 41 Cal.App.5th 951 (*Coneal*), Ryan argues the probative value of the lyrics is low because they do not necessarily represent real events. It is true, as *Coneal* observed in quoting our Supreme Court, that lyrics may only be figurative expressions; thus, if "'a piece of paper were found in Don McLean's home containing the handwritten words, "Drove my Chevy to the levee but the levee was dry," that would not mean that McLean personally drove a Chevrolet to a levee and discovered it lacked water.'" (*Coneal*, at p. 968, quoting *People v. Melendez* (2016) 2 Cal.5th 1, 24.)

But as *Coneal* also recognized, the probative value of written expressions, including lyrics, increases when they "are written within a reasonable period of time before or after the charged crime and bear a sufficient level of similarity to [it]." (*Coneal*, *supra*, 41 Cal.App.5th at p. 969.) Thus, the court there found only that the gangster rap lyrics at issue had been admitted erroneously because they were cumulative, not because they were irrelevant—indeed, the defendant conceded they were relevant. (*Coneal*, at p. 966.)

The admission of song lyrics is not unusual when they constitute circumstantial evidence of a defendant's intent or motivation. (E.g., *People v. Johnson* (2019) 32 Cal.App.5th 26, 60-62; *People v. Zepeda* (2008) 167 Cal.App.4th 25, 35; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373.) The court's probity decision "turn[s] on whether the lyrics were relevant to the charges." (*People v. Singh* (2017) 13 Cal.App.5th 1187, 1196, review granted and cause transferred on another ground Dec. 13, 2017, S244552.) The trial court may not admit irrelevant evidence, but it has broad discretion in determining whether evidence is relevant. (*People v. Babbitt* (1988) 45 Cal.3d 660, 681.) We review the court's decision under the deferential abuse of discretion standard. (*People v. Carter* (2005) 36 Cal.4th 1114, 1166-1167.)

The trial court excluded other proffered lyrics, but concluded it was not a "hard decision" to admit the stanza written 11 months before the crime. We find no

abuse of discretion as to these lyrics. The jury reasonably could infer Ryan expressed a predatory intent in penning the lines about cruising in his vehicle to pick up women under the influence of an intoxicant ("sexy bitches that's tweak'in"). The lyrics were therefore relevant to the sexual assault charges against Ryan.

Ryan argues the lyrics were more prejudicial than probative under Evidence Code section 352 given their vulgarity, implicit disrespect for women, and because he contends they were "likely to evoke an emotional bias against [him]." The court nonetheless admitted the lyrics "because the facts of the underlying case are far more heinous, far more inflammatory." Moreover, "'[a]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case,'" but, "'[i]n applying section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Karis* (1988) 46 Cal.3d 612, 673.) The court did not err.

V.    *Dueñas*

Finally, Ryan contends the trial court violated his right to due process and equal protection by imposing statutory fines and fees without evidence he had the ability to pay them. He relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 which found such a finding is necessary. We find no error.

The trial court imposed the minimum sex offender fine of $300 (§ 290.3), a $40 court operations fee (§ 1465.8), and a $30 criminal assessment fee (Gov. Code, § 70373) on each of Ryan's convictions in counts 2 through 5. On defense counsel's request, the court decreased section 1202.4's restitution fine from the $1,000 figure recommended by the probation department to $300, bringing the total amount imposed in fines and fees to $880.[7]

_____

[7]    The court also ordered Ryan to pay $4,782.95 in direct restitution that had been paid out by a victim's compensation fund, largely for Kendra to relocate to another apartment after the attack; Ryan does not challenge this amount or argue it was subject to an ability to pay determination.

At sentencing, defense counsel requested that the court stay imposition of the fines and fees based on Ryan's asserted inability to pay but presented no evidence regarding his financial condition. He did not suggest Ryan had any medical disability or other condition that would incapacitate him from working in prison.[8] Noting it "gave him the minimum restitution fine of $300," the court declined to waive the fees altogether. The court observed Ryan "is going to have a chance to earn fees in state prison" and concluded, "I don't believe the defense has met their burden to show that he is unable to pay the fees . . . ."

Ryan argues the court erred by placing the burden on him to show he could not pay the statutory amounts imposed. The burden issue is currently pending before our high court in *People v. Kopp* (2019) 38 Cal.App.5th 47, 95, review granted Nov. 13, 2019, S257844. While *Kopp* is pending, we join those courts which have found there is no due process violation in allocating the burden to the defendant. (E.g., *People v. Cowan* (2020) 47 Cal.App.5th 32, 49, review granted June 17, 2020, S261952); *People v. Santos* (2019) 38 Cal.App.5th 923, 934.) This accords with longstanding precedent that is it "incumbent upon the defendant," as the "most knowledgeable person regarding [his or her] ability to pay," to "demonstrate why it should not be imposed." (*People v. McMahan* (1992) 3 Cal.App.4th 740, 749-750.) It is also consistent with high court precedent. "[T]he 'burden of proving an exonerating fact'"—in this case, an inability to

<hr />

[8] While Ryan declined to be interviewed for the probation report, his attorney provided the following information for the report: "At the time of his arrest, Kyle Ryan was a senior at UCI, majoring in social ecology. He made Dean's List, was on the Garden Committee, and was a committee member of the Associated Student Government. He earned an A.A. degree from Santa Ana College, where he was the President of the Environmental Club and a Sustainability Commissioner for the Associated Student Government. He also ran for Student Trustee in 2014. Prior to that, he attended Goldenwest College, where he was elected as the Financial Commissioner and was a chair of the Sustainability Committee." Ryan was 36 years old at the time of sentencing, six feet tall and 150 pounds.

pay even minimum statutorily-mandated fines—"'"may be imposed on a defendant if its existence is "peculiarly" within his personal knowledge and proof of its nonexistence by the prosecution would be relatively difficult or inconvenient."'"" (*People v. Mower* (2002) 28 Cal.4th 457, 477.)  That is the case here where any inability to pay minimum fines was peculiarly within Ryan's knowledge.

Ryan asserts the trial court's reference to prison wages did not establish he could pay the amounts owed.  The weight of authority is to the contrary.  "'Ability to pay does not necessarily require existing employment or cash on hand.'" (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837.)  That ability may be inferred from the opportunity to earn prison wages.  (E.g., *People v. Johnson* (2019) 35 Cal.App.5th 134, 139; *People v. Castellano* (2019) 33 Cal.App.5th 485, 490; *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397.)  "Every able-bodied person committed to [custody] is obligated to work." (Cal. Code Regs., tit. 15, § 3040, subd (a).)  Nothing in the record suggests Ryan is unable to work in prison, where he can earn between $12 and $56 per month under governing regulations.  (*Id.*, § 3041.2, subd. (a)(1) [setting pay scale]; *People v. Aviles*  (2019) 39 Cal.App.5th 1055, 1076.)  Those wages may be applied to the amounts owed.  Substantial evidence supports the trial court's imposition of fines.

## DISPOSITION

The judgment is affirmed.


GOETHALS, J.

WE CONCUR:


O'LEARY, P. J.


ZELON, J.*

  *Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.